# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, GOVERNMENT
COORDINATING COUNCIL 1 (GCC-1)
4065 S. 179th Drive
Goodyear, Arizona 85338

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, LOCAL 77
19415 International Boulevard
SeaTac, Washington 98188

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, LOCAL 283
814 Airport Boulevard
Austin, Texas 78702

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, LOCAL 611
4921 Alexander Boulevard NE
Albuquerque, New Mexico 87107

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, LOCAL 640
5808 N. 7th Street
Phoenix, Arizona 85014

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, LOCAL 1002
12510 E. 21st Street
Tulsa, Oklahoma 74129

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, LOCAL 1245
30 Orange Tree Circle
Vacaville, California 95687

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, LOCAL 1759
PO Box 56
Cody, Wyoming 82414

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, LOCAL 1959
PO Box 3418
Rapid City, South Dakota 57709

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, LOCAL 2159
PO Box 757
Montrose, Colorado 81402

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

*Plaintiffs,*

v.

DONALD J. TRUMP
in his official capacity as President of the U.S.,
1600 Pennsylvania Ave NW
Washington, D.C. 20500

UNITED STATES DEPARTMENT OF
ENERGY
1000 Independence Avenue S.W.
Washington, D.C. 20585

CHRIS WRIGHT
in his official capacity as Secretary for the
U.S. Department of Energy
1000 Independence Avenue
SW. Washington, D.C. 20585

UNITED STATES DEPARTMENT OF THE
INTERIOR,
1849 C Street NW
Washington, DC 20240

DOUG BURGUM
in his official capacity as Secretary for the
U.S. Department of Interior
1849 C Street NW
Washington, DC 20240

*Defendants.*

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

3121541

## INTRODUCTION

1.      Plaintiffs International Brotherhood of Electrical Workers ("IBEW"), Local Unions 77, 283, 611, 640, 1002, 1245, 1759, 1959, 2159, and IBEW Government Coordinating Council-1 (collectively, "Plaintiffs") bring this lawsuit to challenge the unlawful actions of President Donald J. Trump, the United States Department of Energy ("DOE") and its Secretary Chris Wright, and the United States Department of Interior ("DOI") and its Secretary Doug Burgham (collectively, "Defendants").

2.      Since 1978, Congress has recognized that "labor organizations and collective bargaining in the civil service are in the public interest."  5 U.S.C. § 7101(a).  In the Civil Service Reform Act of 1978 ("CSRA"), Congress codified an extensive labor-management relations framework for federal civil servants in the Federal Service Labor-Management Relations Statute ("FSLMRS"), which is codified at Chapter 71 of Title 5 of the United States Code ("Chapter 71").

3.      Chapter 71 grants the President authority to "issue an order excluding any agency or subdivision thereof from coverage under this chapter," *i.e.*, from Chapter 71's obligation to engage in collective bargaining, "if the President determines that—(A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and (B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1).

4.      But the President's authority under Section 7103 does not extend to Plaintiffs, who were granted an express statutory exemption by Congress.  Within the framework of the CSRA, Congress recognized the need to preserve the pre-existing collective bargaining rights of certain federal prevailing rate employees who engage in jobs that are essential to the security and stability of the nation's infrastructure.  Accordingly, Congress enacted Section 704 of the CSRA, which protects the right of these employees to bargain collectively with federal agencies about

1

terms and conditions of employment and other employment benefits ***regardless of any provision of Chapter 71***, including Section 7103.

5.       Indeed, as to Plaintiffs and the employees they represent, Section 704 was intended to "preserve unchanged the scope and substance of the existing collective bargaining relationship between the employees' representatives and the agencies involved" by "exclud[ing] these employees from the restrictions on the scope of collective bargaining under chapter 71…" H.R. Rep. No. 95–1403, 95th Cong., 2d Sess. 61–62 (1978).

6.       Notwithstanding the clear protection of Section 704, on March 27, 2025, President Trump issued Executive Order 14251 entitled "Exclusions from Federal-Labor Management Relations Programs," which invoked Section 7103(b)(1) and purports to strip the vast majority of federal workers of their right to bargain collectively.  As relevant here, Section 2 of EO 14251 purports to eliminate collective bargaining rights for workers in the DOE supposedly on the basis that the agency has "as a primary function intelligence, counterintelligence, investigative, or national security work" and that Chapter 71 "cannot be applied to [the DOE] in a manner consistent with national security requirements and considerations."

7.       Likewise, on August 28, 2025, President Trump issued Executive Order 14343 entitled "Further Exclusions from the Federal Labor-Management Relations Program."  EO 14343 purports to eliminate collective bargaining rights for additional federal employees including, as relevant here, those in "[u]nits in the Bureau of Reclamation with primary responsibility for operating, managing, or maintaining hydropower facilities."  Like EO 14251, EO 14343 was purportedly based on Section 7103(b)(1).

8.       Taken together, Executive Order 14251 and Executive Order 14343 (the "Executive Orders") rely on Chapter 71 purportedly to eliminate collective bargaining rights for federal prevailing rate employees.  But the Executive Orders plainly contradict Section 704, which protects Plaintiffs' collective bargaining rights notwithstanding anything in Chapter 71— including Section 7103.  Section 704 protects the right of federal prevailing rate employees,

2

including the prevailing rate employees represented by Plaintiffs, to bargain collectively. This right cannot be unilaterally revoked by executive action, and the President's attempt to do so through the Executive Orders directly contravenes Section 704. Accordingly, the President's actions are *ultra vires*, contrary to Chapter 71, and violate the separation of powers.

9.     The Executive Orders also violate the First Amendment because they retaliate against Plaintiffs, their members, and the employees they represent for (a) the IBEW International's political advocacy and opposition to the Trump Administration's policies, (b) litigation by certain IBEW-affiliated locals against the administration, and (c) Plaintiffs' association with the IBEW International and the IBEW-affiliated locals who sued the administration.

10.    Finally, the Executive Orders also violate the Fifth Amendment because they unlawfully strip away contractual rights and protections from federal employees represented by Plaintiffs without being provided with due process required by the Fifth Amendment and unilaterally abrogate property rights guaranteed by a contract with the federal government.

11.    Because Defendants' actions are *ultra vires* and violate Plaintiffs' and their members' constitutional rights, the Executive Orders should be enjoined and declared unlawful with respect to federal employees protected by Section 704 of the CSRA.

## JURISDICTION

12.    This court has jurisdiction under 28 U.S.C. § 1331 as this action arises under federal law, including the United States Constitution and the Administrative Procedure Act, 5 U.S.C. § 701, *et seq*.

## VENUE

13.    Venue is proper in the District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(e)(1) because each Defendant is an agency or officer of the United States residing within this District and because a substantial part of the events or omissions giving rise to the claim occurred within this District.

3

**PARTIES**

14.     Plaintiff Government Coordinating Council-1 ("GCC-1") is a labor council that focuses on issues affecting IBEW's federally employed members, particularly those employed by the Western Area Power Administration ("WAPA"), one of the four Power Marketing Administrations within the DOE.  GCC-1 is the exclusive bargaining representative for all prevailing rate WAPA employees represented by Local Unions 640, 1245, 1759, 1959, and 2159. The prevailing rate WAPA employees represented by GCC-1 work in a variety of classifications including as protection and communication craftsmen, heavy equipment mechanics, converter technicians, heavy equipment operators, linemen, and electricians.  There are approximately 416 federal employees in the bargaining units represented by GCC-1, which are made up of the WAPA members of IBEW Locals 640, 1245, 1759, 1959, and 2159.  GCC-1 and the federal prevailing rate employees it represents are protected by Section 704 of the Civil Service Reform Act of 1978.

15.     Plaintiff International Brotherhood of Electrical Workers, Local Union 77 ("IBEW Local 77") is a labor organization that represents approximately 182 federal prevailing rate employees working for the Bureau of Reclamation ("BOR").  Members of IBEW Local 77 engage in the operation and maintenance of water, irrigation, and power facilities in a variety of classifications including as craftsmen, mechanics, electricians, powerplant operators, linemen, and utilitymen.  IBEW Local 77 is headquartered in Washington, with offices in SeaTac, Kennewick, and Spokane Valley.  IBEW Local 77 and the federal prevailing rate employees it represents at the Columbia Cascades Area Office and the Grand Coulee Power Office are protected by Section 704 of the Civil Service Reform Act of 1978.

16.     Plaintiff International Brotherhood of Electrical Workers, Local Union 283 ("IBEW Local 283") is a labor organization that represents approximately 48 federal prevailing rate employees working for the BOR.  Members of IBEW Local 283 engage in the operation and maintenance of irrigation and power facilities in a variety of classifications including as plant

mechanics, plant operators, control center operators, electricians, and dam tenders.  IBEW Local 283 is headquartered in Declo, Idaho.  IBEW Local 283 and the federal prevailing rate employees it represents are protected by Section 704 of the Civil Service Reform Act of 1978.

17.    Plaintiff International Brotherhood of Electrical Workers, Local Union 611 ("IBEW Local 611") is a labor organization that represents approximately 17 federal prevailing rate employees working for the BOR.  Members of IBEW Local 611 perform operation and maintenance tasks in a variety of classifications including as powerplant operators, powerplant electricians, powerplant mechanics, powerplant control room operators, and utility workers. IBEW Local 611 is headquartered in Albuquerque, New Mexico.  IBEW Local 611 and the federal prevailing rate employees it represents are protected by Section 704 of the Civil Service Reform Act of 1978.

18.    Plaintiff International Brotherhood of Electrical Workers, Local Union 640 ("IBEW Local 640") is a labor organization that represents approximately 23 federal prevailing rate employees working for the BOR, and approximately 78 federal prevailing rate employees working for WAPA.  Members of IBEW Local 640 employed by BOR perform operation and maintenance tasks in a variety of classifications including as electricians, hydroelectric mechanics, powerplant operators, and utilitymen.  Members of IBEW Local 640 employed by WAPA work in a variety of classifications including as protection and communication craftsmen, heavy equipment mechanics, converter technicians, heavy equipment operators, linemen, and electricians.  IBEW Local 640 is headquartered in Phoenix, Arizona.  IBEW Local 640 and the federal prevailing rate employees it represents are protected by Section 704 of the Civil Service Reform Act of 1978.

19.    Plaintiff International Brotherhood of Electrical Workers, Local Union 1002 ("IBEW Local 1002") is a labor organization that represents approximately 68 federal prevailing rate employees working for the Southwestern Power Administration ("SWPA"), one of the four Power Marketing Administrations within the DOE.  Members of IBEW Local 1002 perform work on electrical facilities in a variety of classifications including as electricians, linemen,

3121541

equipment operators, and electric control craftsmen. IBEW Local 1002 is headquartered in Tulsa, Oklahoma. IBEW Local 1002 and the federal prevailing rate employees it represents are protected by Section 704 of the Civil Service Reform Act of 1978.

20.     Plaintiff International Brotherhood of Electrical Workers, Local Union 1245 ("IBEW Local 1245") is a labor organization that represents approximately 137 federal prevailing rate employees working within the BOR, a subdivision of the DOI, and approximately 47 federal prevailing rate employees working for WAPA. Members of IBEW Local 1245 employed by BOR work in a variety of classifications including as electricians, equipment mechanics, plant mechanics, hydroelectric operators, and irrigation systems mechanics. Members of IBEW Local 1245 employed by WAPA perform work in a variety of classifications including as protection and communication craftsmen, heavy equipment mechanics, converter technicians, heavy equipment operators, linemen, and electricians. IBEW Local 1245 is headquartered in Vacaville, California. IBEW Local 1245 and the federal prevailing rate employees it represents are protected by Section 704 of the Civil Service Reform Act of 1978.

21.     Plaintiff International Brotherhood of Electrical Workers, Local Union 1759 ("IBEW Local 1759") is a labor organization that represents approximately 130 federal prevailing rate employees working for the BOR and approximately 89 federal prevailing rate employees working within WAPA. Members of IBEW Local 1759 employed by BOR work in a variety of classifications including as electricians, plant mechanics, powerplant operators, and control center operators. Members of IBEW Local 1759 employed by WAPA work in a variety of classifications including as protection and communication craftsmen, heavy equipment mechanics, converter technicians, heavy equipment operators, linemen, and electricians. IBEW Local 1759 is headquartered in Cody, Wyoming. IBEW Local 1759 and the federal prevailing rate employees it represents are protected by Section 704 of the Civil Service Reform Act of 1978.

22.     Plaintiff International Brotherhood of Electrical Workers, Local Union 1959 ("IBEW Local 1959") is a labor organization that represents approximately 157 federal

6

prevailing rate employees working for WAPA=.  Members of IBEW Local 1959 work in a variety of classifications including as protection and communication craftsmen, heavy equipment mechanics, converter technicians, heavy equipment operators, linemen, and electricians.  IBEW Local 1959 is headquartered in Watertown, South Dakota.  IBEW Local 1959 and the federal prevailing rate employees it represents are protected by Section 704 of the Civil Service Reform Act of 1978.

23.     Plaintiff International Brotherhood of Electrical Workers, Local Union 2159 ("IBEW Local 2159") is a labor organization that represents approximately 71 federal prevailing rate employees working for the BOR, and approximately 45 federal prevailing rate employees working within WAPA.  Members of IBEW Local 2159 employed by BOR engage in the operation and maintenance of the electric power generation system and related facilities in a variety of classifications including as electricians, plant mechanics, control center operators, utilitymen, and pipefitters.  Members of IBEW Local 2159 employed by WAPA work in a variety of classifications including as protection and communication craftsmen, heavy equipment mechanics, converter technicians, heavy equipment operators, linemen, and electricians.  IBEW Local 2159 is headquartered in Montrose, Colorado.  IBEW Local 2159 and the federal prevailing rate employees it represents are protected by Section 704 of the Civil Service Reform Act of 1978.

24.     Defendant Donald J. Trump is the President of the United States.  He issued the Executive Orders.  He is sued in his official capacity.

25.     Defendant United States Department of Energy is a federal agency headquartered in Washington, D.C.  Relying upon Section 7103, the Executive Orders purport to exclude the Department of Energy from coverage under Chapter 71, and the Department of Energy has refused to recognize certain of Plaintiffs' collective bargaining rights on that basis. WAPA and SWPA are subdivisions of the Department of Energy.

26.     Defendant Chris Wright is the Secretary of Energy and is sued in his official capacity.

7

3121541

27.     Defendant United States Department of the Interior is a federal agency headquartered in Washington, D.C.  Relying upon Section 7103, the Executive Orders purport to exclude the Department of the Interior from coverage under Chapter 71, and the Department of the Interior has refused to recognize certain of Plaintiffs' collective bargaining rights on that basis. BOR is a subdivision of the Department of the Interior.

28.     Defendant Doug Burgum is the Secretary of the Interior and is sued in his official capacity.

## FACTUAL BACKGROUND

**A.    In the 1970s, Congress codified the collective bargaining rights for the federal employees represented by Plaintiffs.**

**1.    In 1972, Congress codified the collective bargaining rights of certain federal prevailing rate employees in the Prevailing Rate Systems Act.**

29.     Wages for most civilian federal employees (*i.e.*, those employed in professional, administrative, technical, or clerical positions) are fixed by the Federal General Schedule.  *See* U.S. Office of Personnel Management "General Schedule," (https://www.opm.gov/policy-data-oversight/pay-leave/pay-systems/general-schedule/).

30.     In 1972, Congress passed the Government Employees Prevailing Rate Systems Act ("PSRA"), Pub.L. No. 92-392, 86 Stat. 564 (1972), codified at 5 U.S.C. §§ 5341–5349, which created a class of federal "prevailing rate employees," who are not subject to the General Schedule.

31.     In the PSRA, Congress recognized that there was a need to standardize pay for prevailing rate employees within the same local wage area and to maintain the level of rates of pay so as to attract and retain qualified prevailing rate employees to work in the federal government.  *See* 5 U.S.C. § 5341.

32.     Accordingly, under the PSRA, hourly wages for prevailing rate employees are calculated based on wages prevailing in the industry in which they work, rather than fixed by the

General Schedule. *U.S. Info. Agency v. Fed. Lab. Rels. Auth.*, 895 F.2d 1449, 1451 (D.C. Cir. 1990); *see also* 5 U.S.C. § 5341.

33.    The PSRA defines a "prevailing rate employee" as "an individual employed in or under an agency in a recognized trade or craft, or other skilled mechanical craft, or in an unskilled, semiskilled, or skilled manual labor occupation . . ."  5 U.S.C. § 5342(a)(2)(A).

34.    The federal "prevailing rate employee" classification covers most trade, craft, and laboring employees.  *See* U.S. Office of Personnel Management "Facts About the Federal Wage System," (https://www.opm.gov/policy-data-oversight/pay-leave/pay-systems/federal-wage-system/facts-about-the-federal-wage-system/).

35.    The PSRA was intended to provide specific safeguards and inducements to individual prevailing rate employees who do not participate in the collective bargaining process. *Medler v. U.S., Bureau of Reclamation, Dep't of the Interior*, 616 F.2d 450, 453 (9th Cir. 1980).

36.    In the PSRA, Congress also recognized, however, that a subset of prevailing rate employees—those who traditionally set their wages through collective bargaining relationships—did not require the same safeguards and inducements because the terms and conditions of employment for this subset of prevailing rate employees were already protected by the contracts negotiated on their behalf by their unions.  Accordingly, Congress made clear that the PSRA was not intended to affect the status of those contracts "or to impair the authority of the parties concerned to renegotiate existing contracts or enter into new agreements."  *Medler*, 616 F.2d at 454 (citing H.R. Rep. No. 92-339, 92nd Cong., 1st Sess. 5, 22 (1971)).

37.    To ensure there was no disruption to, or modification of, the historical collective bargaining relationships for this subset of prevailing rate employees, Congress included a savings clause, set forth in Section 9(b) of the PRSA ("Section 9(b)").  Section 9(b) was directed at "those groups of Federal employees whose wages and other terms or benefits of employment are fixed in accordance with the contracts resulting from negotiations between their agencies and employee organizations."  *Id.* at 453 (citing H.R. Rep. No. 92-339, at 22).  Section 9(b) provides that the PSRA should not be construed to "abrogate, modify, or otherwise affect" any pre-

9

existing negotiated contract provisions dealing with "wages, the terms and conditions of employment, and other employment benefits . . . resulting from negotiations between Government agencies and organizations of Government employees" or "impair in any way" the right of the parties to these bargaining agreements to "renew[], extend[], modify[], or improve[]" the provisions of the bargaining agreements, or replace them with new contracts.  Pub.L. No. 92–392, 86 Stat. at 574.

>     **2.**    **In 1978, Congress codified a comprehensive framework for federal employees to bargain collectively in Chapter 71 of Title 5 of the Civil Service Reform Act.**

38.    In 1978, six years after enacting the PSRA, Congress codified collective bargaining rights for federal workers.  The Federal Service Labor-Management Relations Statute, which is Title VII of the Civil Service Reform Act of 1978, expressly grants "federal employees the right to organize and bargain collectively." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019).  The FSLMRS is set forth in Title VII of the CSRA and codified at Chapter 71 of Title 5 of the U.S Code ("Chapter 71").

39.    Chapter 71 establishes a comprehensive framework governing collective bargaining for federal government employees.  *See* 5 U.S.C. §§ 7101–35.  The framework is based on Congress's determination that statutorily protecting "the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them . . . safeguards the public interest" and "contributes to the effective conduct of public business." *Id.* §§ 7101(a)(1)(A), 7101(a)(1)(B).

40.    Under Chapter 71, employees have "the right to form, join, or assist any labor organization, or to refrain from any such activity, freely and without fear of penalty or reprisal." *Id.* § 7102.  The FSLMRS also guarantees employees the right "to engage in collective bargaining with respect to conditions of employment through representatives chosen by employees under this chapter."  *Id.* § 7102(2).

10

41.     Pursuant to Chapter 71, federal agencies must "accord exclusive recognition to a labor organization if the organization has been selected as the representative, in a secret ballot election, by a majority of the employees in an appropriate unit who cast valid ballots in the election." *Id.* § 7111(a).  Once labor organizations are certified as exclusive representatives, they are "entitled to act for, and negotiate collective bargaining agreements covering, all employees in the unit." *Id.* § 7114(a)(1).

42.     Chapter 71 mandates that covered agencies and labor organizations acting as exclusive representatives "meet and negotiate in good faith for the purposes of arriving at a collective bargaining agreement." *Id.* § 7114(a)(4).  "[I]f agreement is reached," agencies and exclusive representatives are required "to execute on the request of any party to the negotiation a written document embodying the agreed terms, and to take such steps as are necessary to implement such agreement." *Id.* § 7114(b)(5).  Upon "approval by the head of the agency" or their failure to "approve or disapprove the agreement within the 30-day-period, the agreement shall take effect and [] be binding on the agency and the exclusive representative." *Id.* §§ 7114(c)(1), 7114(c)(3).

43.     Bargaining units may not, however, include "any employee engaged in intelligence, counterintelligence, investigative, or security work which directly affects national security." *Id.* § 7112(b)(6).  Accordingly, Congress excluded, by statute, several agencies from Chapter 71's scope, including the Government Accountability Office, the Federal Bureau of Investigation, the Central Intelligence Agency, the National Security Agency, the Tennessee Valley Authority, the Federal Labor Relations Authority, the Federal Service Impasses Panel, and the United States Secret Service and the United States Secret Service Uniformed Division. *Id.* § 7103(a)(3).

44.     The FSLMRS also grants the President limited authority to order additional agencies or subdivisions excluded from Chapter 71's coverage.  The President may only do so, however, after determining that (1) "the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work" and (2) "the provisions

11

of [Chapter 71] cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." *Id.* §§ 7103(b)(1)(A), 7103(b)(1)(B).

45.     In 1979, President Carter invoked Section 7103(b)(1)'s limited authority to issue an executive order excluding specific intelligence and national security agency subdivisions from Chapter 71. *See* Exec. Order No. 12171, *Exclusions from the Federal Labor-Management Relations Program*, 44 Fed. Reg. 66565 (Nov. 19, 1979).

46.     Every president after President Carter, except for President Biden, has used Section 7103(b)(1) to exclude agency subdivisions and organizational subcomponents from Chapter 71. These prior exclusions were narrow, and the subdivisions excluded from Chapter 71 had an obvious link to national security.

47.     For example, President Reagan excluded subdivisions under the Joint Chiefs of Staff and subdivisions of the Department of Energy. *See* Exec. Order 12338, 47 Fed. Reg. 1369 (Jan. 11, 1982). President George H.W. Bush excluded subdivisions of the Department of Justice, such as the National Drug Intelligence Center and Office of Intelligence Policy and Review. *See* Exec. Order 13252, 67 Fed. Reg. 1601 (Jan. 7, 2002). President Obama excluded subdivisions of the Departments of the Army, Navy, and Air Force, as well as other subdivisions of the Department of Defense. *See* Exec. Order 13760, 82 Fed. Reg. 5325 (Jan. 12, 2017). And President Trump, in his first term, excluded the Defense Counterintelligence and Security Agency within the Department of Defense. *See* Exec. Order 13869, 84 Fed. Reg. 18125 (Apr. 24, 2017).

48.     Until this year, Section 7103(b)(1) had never been invoked by a president to exclude an entire Cabinet Department from Chapter 71.

**3.     The CSRA preserved pre-existing bargaining rights of certain prevailing rate employees.**

49.     While Congress promulgated this comprehensive framework governing collective bargaining for federal employees generally, the FSLMRS (*i.e.*, Title VII of the CSRA) also

12

includes Section 704 ("Section 704"), which reaffirms and extends the savings clause of Section 9(b) of the PSRA discussed above. *See* Pub.L. No. 92–454, 92 Stat. 1111, 1218 (1978) (codified at 5 U.S.C. § 5343 note).

50.    Like Section 9(b) of the PSRA, Section 704 exists to protect the historical collective bargaining rights and relationships of federal prevailing rate employees.

51.    Section 704(a) provides that the "terms and conditions of employment and other employment benefits with respect to Government prevailing rate employees to whom section 9(b) of Public Law 92-392 applies which were the subject of negotiation in accordance with prevailing rates and practices prior to August 19, 1972, shall be negotiated . . . in accordance with the provisions of section 9(b) of Public Law 92-392 ***without regard to any provision of chapter 71*** of title 5 . . . to the extent that any such provision is inconsistent with this paragraph." *Id.* (emphasis added).

52.    Section 704(b) further provides that "[t]he pay and pay practices relating to employees referred to in paragraph (1) of this subsection shall be negotiated in accordance with prevailing rates and practices ***without regard to any provision of . . . chapter 71*** of title 5…to the extent that any such provision is inconsistent with this paragraph . . . " *Id.* (emphasis added).

53.    In other words, as long as a particular term and condition of employment or employment benefit was subject to negotiation prior to August 19, 1972, Section 704 preserves for prevailing rate employees to whom Section 9(b) applies the right to bargain collectively as to that subject matter regardless of any other provisions of Chapter 71, which includes Section 7103.

54.    Section 704 was intended to "preserve unchanged the scope and substance of the existing collective bargaining relationship between the employees' representatives and the agencies involved" by "exclud[ing] these employees from the restrictions on the scope of collective bargaining under chapter 71 . . . " H.R. Rep. No. 95-1403, at 61–62.  Section 704 "'grandfather[s]-in' bargaining rights for prevailing rate employees with respect to subjects that

might otherwise be non-negotiable 'management rights' under 5 U.S.C. § 7106 or non-negotiable pay provisions reserved to agency regulation."  *U.S. Info. Agency*, 895 F.2d at 1451.

55.    Section 704 thus maintains the collective bargaining rights and relationships for those prevailing rate employees to whom Section 9(b) applies, and that existed as of August 19, 1972, in order to ensure that these critical federal employees are not lost to the private sector. *See* 124 Cong. Rec. 25, 722 (1978) (explaining that the existing collective bargaining relationships resulted in "some of the most stable and effective collective bargaining in the history of public employee labor relations.").

56.    Section 704 is grounded in Congress's concerns about losing federal prevailing rate employees—particularly those employees in the DOI and the DOE—to the private sector given that these employees are critical to ensuring the reliability of the nation's power grid and electrical infrastructure.  124 Cong. Rec. 25, 722 (1978) (explaining that these collective bargaining relationships were critical in "enabl[ing] the Federal Government to procure and retain qualified craft employees who otherwise might choose employment in private industry…"); *see also* H.R. Rep. No. 95-1403, 95th Cong., 2d Sess. 61–62 (1978).

**B.    Plaintiffs represent over one thousand federal prevailing rate employees whose collective bargaining rights are protected by Section 704.**

**1.    Plaintiffs represent prevailing rate employees working at WAPA, SWPA and the BOR.**

57.    Plaintiffs represent, among others, prevailing rate employees working in the Department of Energy's Western Area Power Administration, the Department of Energy's Southwestern Power Agency, and the Department of the Interior's Bureau of Reclamation.

58.    The United States Department of Energy oversees national energy policy and energy production, including generating hydroelectric power.

59.    WAPA, SWPA, the Southeastern Power Administration ("SEPA"), and the Bonneville Power Administration ("BPA") are the DOE's four Power Marketing Administrations responsible for selling electrical output from federally owned and operated

14

hydroelectric dams.  U.S. Department of Energy, "Power Marketing Administrations,"
(https://www.energy.gov/power-marketing-administrations).  The four agencies "span[] 34 states
and suppl[y] power to various regions throughout the country."  *Id.*

60.    The four Power Marketing Administrations provide critical sources of energy and
grid stabilization within the DOE.

61.    WAPA is responsible for marketing and delivering reliable, cost-based federal
hydroelectric power generated at 57 hydropower plants across a 15-state service area in the
central and western United States, spanning more than 17,000 circuit miles.

62.    SWPA is responsible for marketing and delivering reliable, cost-based federal
hydroelectric power generated at 24 hydropower plants across a 6-state service area in the
southwestern United States.

63.    The United States Department of the Interior is responsible for the management
and conservation of federal land and natural resources in the United States, including water and
energy resources.

64.    The BOR is the primary agency within the DOI that regulates energy policy and
production by managing over 470 dams throughout the western United States.  The BOR is the
second-largest producer of hydropower in the United States and operates 53 hydroelectric
powerplants across a 17-state service region in the western United States that annually produce,
on average, 40 billion kilowatt-hours of cost-based federal hydroelectric energy.

65.    IBEW-represented employees at WAPA, SWPA and the BOR work in multiple
trades including, for example, as electricians, linemen, operators, protection, communications,
control center operators, plant operators, plant mechanics, and plant electricians.

66.    Electricians install, construct, commission, maintain, troubleshoot, and repair
equipment in high voltage switchyards, substations, communication facilities and power
operations centers.  Electricians are responsible for maintaining the life cycle of breakers and
transformers to provide stability for the nation's power grid.

3121541

67.     Lineman and operators erect, troubleshoot, and repair transmission and distribution power lines, and they maintain the path of the transmission lines to reduce the risk of fires.  Plaintiffs' members in these trades travel to restore power to locations after national disasters have left many citizens without power.

68.     Protection and communication workers maintain, repair, modify, program, install, and commission power system substation protection control, monitoring, metering, and communication equipment.  Protection and communication workers ensure that in the event of failed equipment or a fallen line that the power system is isolated and the public is protected from the danger of contact with high voltage power.

69.     Control center operators conduct the overall monitoring and remote operation of the power generation and water conveyance systems of multiple power plants, generators, pumps, dike flood control pumps, condensers, water release gates, switchyards, reservoirs, canals, and basins.

70.     Plant operators operate the main units, switchyard, and station service boards which involves the starting, stopping and control of generator/pump units, auxiliary equipment and water release equipment.  Plant operators also respond to trouble alarms and take action necessary to protect equipment and facilities from damage and maintain the integrity of the system.

71.     Plant mechanics identify and correct problems causing mechanical equipment malfunctions on turbines, generators, governors, motors, pumps, penstocks, transformers, and spill ways.  Plant mechanics also ensure all of the equipment in the hydroelectric power plants, pumping plants, industrial treatment plants, and dams operate correctly to control water flow and prevent flooding or harm to the public.

72.     Plant electricians install, maintain, and troubleshoot issues with electrical equipment and devices in electric generating stations and other ancillary facilities.  Plant electricians install and service equipment such as generators, exciters, governor controls, transformers, power circuit breakers, battery systems, switches, and switchboards.

16

73.     WAPA employees represented by Plaintiffs are responsible for maintaining the energy grid across a 15-state service region in the central and western United States.  Their work is essential to maintaining the nation's high voltage electrical system.

74.     SWPA employees represented by Plaintiffs are responsible for maintaining the energy grid across a 6-state service area in the southwestern United States.  Their work is essential to maintaining the nation's high voltage electric system.

75.     BOR employees represented by Plaintiffs are responsible for maintaining the energy grid across a 17-state region in the western United States.  Their work is essential to maintaining the West's water management and the nation's high voltage electric system.

**2.     Plaintiffs and the federal prevailing rate employees they represent have bargained collectively with WAPA, SWPA, and the BOR since before 1972.**

76.     IBEW-represented employees have been working for the DOE and the BOR for decades and have a long history of bargaining collectively with both agencies.

77.     In the early 20th century, the BOR began authorizing large projects, starting with the Boulder Canyon (Hoover Dam) Project in 1928.  Between 1930 and 1965, the BOR saw over 70 largescale projects begin, including the Columbia Basin Project in 1933, the Pick-Sloan Missouri Basin Project in 1944, and the Colorado River Storage Project in 1956.

78.     When workers were hard to come by for these large projects, the BOR completed the work by "force account," meaning that BOR employees, rather than contractors, were put to work constructing the BOR's project.  These force account workers unionized, setting the stage for the IBEW's representation.

79.     When the Department of Energy was created in 1977, WAPA and SWPA were reorganized as subdivisions of the DOE.  IBEW-represented employees who had previously worked for the BOR continued their pre-existing bargaining relationship with DOE as prevailing rate employees.

80.     Plaintiffs perform key functions for the bargaining unit employees they represent, including: collectively bargaining on behalf of employees in negotiations with employers over wages, working conditions, and other employment-related matters; providing training and apprenticeship opportunities for electricians and other electrical workers; providing support and resources in the form of legal assistance; engaging in community service and outreach efforts; and working to enforce labor agreements by ensuring that employers adhere to the terms and conditions of the contracts negotiated with Plaintiffs.  Each of these functions aims to improve the economic and social conditions of Plaintiffs' members and to obtain fair wages and safe working conditions commensurate with those enjoyed by private sector employees in the industry.

81.     To those ends, Plaintiffs have bargained for and entered into collective bargaining agreements ("CBAs") with WAPA, SWPA and the BOR on behalf of the prevailing rate employees they represent.

82.     GCC-1 is the exclusive bargaining representative for all prevailing rate employees of IBEW Local Unions 640, 1245, 1759, 1959, and 2159 employed by WAPA.  The prevailing rate employees working at WAPA represented by IBEW Local Unions 640, 1245, 1759, 1959, and 2159 have collectively bargained with WAPA or its predecessor since before August 19, 1972.  Through GCC-1, IBEW Local Unions 640, 1245, 1759, 1959, and 2159 entered into the most recent CBA with WAPA, effective from October 1, 2022, through September 30, 2028.

83.     The prevailing rate employees working at SWPA represented by IBEW Local Union 1002 have collectively bargained with SWPA since before August 19, 1972.  IBEW Local Union 1002 entered into the most recent CBA with SWPA, effective from September 22, 2021 through September 30, 2026.

84.     The prevailing rate employees working at BOR represented by IBEW Local Union 77 have collectively bargained with BOR at the Columbia Cascades Area Office and the Grand Coulee Power Office of the BOR since before August 19, 1972.  IBEW Local Union 77 entered into two recent CBAs with BOR.  The agreement between Local Union 77 and the

Columbia-Cascades Area Office of the BOR is effective from December 2, 2023 to December 2, 2027.  The agreement between Local Union 77 and the BOR Grand Coulee Power Office is effective from July 1, 2025, to July 1, 2029.

85.     The prevailing rate employees working at BOR represented by IBEW Local Union 283 have collectively bargained with BOR since before August 19, 1972.  IBEW Local Union 283 entered into the most recent CBA with BOR, effective from November 24, 2021 through November 24, 2025.

86.     The prevailing rate employees working at BOR represented by IBEW Local Union 611 have collectively bargained with BOR since before August 19, 1972.  Indeed, IBEW Local Union 611 entered into a CBA with BOR on May 7, 1971, which remains in effect, as amended, including by the parties' adoption of a 2024 wage schedule, effective beginning October 31, 2024.

87.     The prevailing rate employees working at BOR represented by IBEW Local Union 640 have collectively bargained with BOR since before August 19, 1972.  IBEW Local Union 640 entered into the most recent CBA with BOR, effective October 3, 2024 through October 2, 2025.

88.     The prevailing rate employees working at BOR represented by IBEW Local Union 1245 have collectively bargained with BOR since before August 19, 1972.  IBEW Local Union 1245 entered into the most recent CBA with BOR, effective from August 1, 2023 through December 31, 2025.

89.     The prevailing rate employees working at BOR represented by IBEW Local Union 1759 have collectively bargained with BOR since before August 19, 1972.  IBEW Local Union 1759 entered into two recent CBAs with BOR.  The agreement between Local Union 1749 the Eastern Colorado/Wyoming Area Office is effective from October 6, 2024 to September 2029.  The agreement between IBEW Local Union 1759 and the Montana Office is effective from July 28, 2024 to July 2029.

19

90.     The prevailing rate employees working at BOR represented by IBEW Local Union 2159 have been bargaining with BOR since before August 19, 1972.  IBEW Local Union 2159 is currently a party to a CBA with BOR, effective through 2025.

91.      The CBAs negotiated by Plaintiffs cover the terms and conditions of employment, including, but not limited to: regular and overtime wages; work schedules; safety requirements; joint craft training committees; and mandated rest periods.  For example, the CBA between Local Union 1002 and SWPA memorializes the process by which employees may file grievances relating to breaches of the CBA, and mandates that SWPA and the union will attempt to resolve the disagreement informally prior to seeking the intervention of the Federal Labor Relations Authority.  Likewise, the CBA between GCC-1 and WAPA establishes a Joint Craft Training Committee, which oversees the training and apprenticeship programs for IBEW-represented employees.

92.     In sum, Plaintiffs represent employees who are "prevailing rate employees" under the PRSA and who fall within the protections of Section 9(b) because their "wages, the terms and conditions of employment, and other employment benefits" were determined through collective bargaining prior to August 19, 1972.  Accordingly, under Section 704, Plaintiffs and the employees they represent maintain the ongoing right to bargain collectively over the terms and conditions of employment and other employment benefits that are not subject to any Presidential authority conferred by Section 7103.

**3.     Plaintiffs and the IBEW advocate publicly for the federal prevailing rate employees they represent.**

93.     In addition to representing and bargaining for improved pay and working conditions for the bargaining unit employees they represent, Plaintiffs and the IBEW International also advocate for policies that will protect the interests of their members and the bargaining unit employees they represent.  Plaintiffs and the IBEW International likewise speak out against policies that are harmful to the interests of their members and the bargaining unit

20

employees they represent. In exercising these functions, Plaintiffs and the IBEW International have made statements critical, and adopted political positions adverse to the interests, of President Trump.

94.    In August 2016, when Donald Trump was the GOP presidential nominee, the IBEW investigated Trump's use of nonunion labor in his real estate development projects, concluding that Trump only used union workers when he was required to by local laws and criticizing Trump's preference for nonunion labor. *The Electrical Worker*, "Does Trump Build Union? An IBEW Investigation," Vol. 10, No. 8 (Aug. 2016) (https://ibew.org/wp-content/uploads/2024/10/IBEW-EW-V10-N08.pdf).

95.    On June 6, 2022, the IBEW International's then-President Lonnie Stephenson issued a statement supporting the Biden-Harris administration's clean energy and climate agenda, policies which the Trump administration has opposed. *See* IBEW Media Center, "IBEW President Lonnie Stephenson's Statement on the Biden Administration's Actions to Spur Clean Energy Manufacturing (June 6, 2022) (https://www.ibewapp.org/media-center/Articles/22Daily/2204/SpurClea-Energy).

96.    The IBEW International publicly supported President Joe Biden's re-election campaign in 2024 due to his "dedication to unionism," his issuance of executive orders that "reverse[d] policies that have eroded unionists' strength," and his support of the enactment of the Richard L. Trumka Protecting the Right to Organize (PRO) Act, a bill aimed at strengthening workers' rights to bargain collectively. *See* IBEW Government Affairs "IBEW Endorses President Biden and Vice President Harris for Re-Election" (Apr. 25, 2023) (https://ibewgov.org/ibew-endorses-president-biden-and-vice-president-harris-for-re-election/).

97.    After President Biden announced he was dropping out of the race, the IBEW International quickly and publicly endorsed then-Vice President Harris' presidential campaign, praising her support for union members and contrasting it with the Trump Administration's "massive tax cut for corporations and the wealthy." *See* IBEW Government Affairs "IBEW Endorses Proven Ally Vice President Kamala Harris for President of the United States" (July 22,

2024) (https://ibewgov.org/ibew-endorses-proven-ally-vice-president-kamala-harris-for-president-of-the-united-states/).

98.    In November 2024, IBEW International President Kenneth Cooper issued a statement upon President Trump's re-election.  In the statement, Mr. Cooper stated that the IBEW had "serious reservations about President's Trump's commitment to working people." International Brotherhood of Electrical Workers, "IBEW Statement on Donald's Trump's Election" (Nov. 7, 2024) (https://ibew.org/press-release/ibew-statement-on-donald-trumps-election/).  Although Mr. Cooper pledged that the IBEW would work with the Trump Administration where possible, he promised that the IBEW would "push back with everything we have" when necessary.  *Id.*  Mr. Cooper also promised that the IBEW would "not shy away from" fights with the Trump Administration and would carry on the work it began in the first Trump Administration, fighting against "disastrous proposals to water down the IBEW's apprenticeship program" and "the expansion of the right-to-work and the contraction of the prevailing wage."  *Id.*

99.    After President Trump took office, Mr. Cooper publicly criticized President Trump's policies, issuing two separate statements opposing President Trump's tax bill.  In his May statement, Mr. Cooper stated that the tax bill "will not only stop renewable energy development at exactly the moment the country needs these investments the most; it will kill tens of thousands of good-paying energy jobs, many of them for IBEW members, all in the name of tax breaks to billionaires like Elon Musk."  International Brotherhood of Electrical Workers, "GOP Mega Bill Jeopardizes America's Energy Future, Kills Jobs to Pay for Billionaire Tax Cut," (May 14, 2025) (https://ibew.org/press-release/gop-mega-bill-jeopardizes-americas-energy-future-kills-jobs-to-pay-for-billionaire-tax-cut/).  Similarly, in August 2025, Mr. Cooper called out the negative impact President Trump's tax bill would have on working-class Americans like IBEW members: "Not only will this bill kill hundreds of thousands of jobs that would have been IBEW jobs, but it will rip the rug from under a generation of would-be apprentices and billions of dollars of our wages will evaporate."  International Brotherhood of

3121541

Electrical Workers, "The Great Betrayal," (Aug.1, 2025) (https://ibew.org/electrical_worker/the-great-betrayal/).

**C.    President Trump issued Executive Order 14251 to retaliate against unions that oppose him politically.**

100.    On March 27, 2025, President Trump issued Executive Order 14251, entitled "Exclusions from Federal Labor-Management Relations Programs" ("EO 14251"), invoking Section 7103(b)(1) to exclude numerous agencies entirely from coverage under Chapter 71.

101.    EO 14251 is unprecedented in its scope.  It excludes nearly two-thirds of the federal workforce from the FSLMRS, including nearly the entirety of the DOE, and certain subdivisions of the DOI (the Office of the Secretary, Bureau of Land Management, Bureau of Safety and Environmental Enforcement, and Bureau of Ocean Energy Management).  The government has since admitted that EO 14251 goes far beyond the scope of any prior executive order invoking Section 7103(b)(1).  *See Am. Fed. Of Gov. Emps., AFL-CIO v. Trump*, No. 25-CV-03070-JD, 2025 WL 1755442, at \*5 (N.D. Cal. June 24, 2025) (". . . the government conceded the next closest Executive Order in scope was EO 12171 signed by President Carter, which the government acknowledged did not come close to the scope of EO 14251.").

102.    EO 14251 purports to justify its unprecedented exclusion of swaths of the federal workforce from collective bargaining rights on the ground that they "have a primary function intelligence, counterintelligence, investigative, or national security work" and that "Chapter 71 of title 5 cannot be applied to these agencies and agency subdivisions in a manner consistent with national security requirements and considerations."  Exec. Order No. 14251, 90 Fed. Reg. 14553 (Mar. 27, 2025).  But the inclusion of agencies such as the National Institute of Allergy and Infectious Diseases, the National Institutes of Health, the Bureau of Land Management, the Bureau of Ocean Energy Management, the Animal and Plant Health Inspection Service, the National Science Foundation, and the International Trade Commission reveals the pretextual nature of President Trump's conclusory "determinations."

103.    The President also made some efforts to protect unions or trades that he favors from EO 14251's effect.  EO 14251 purports to contain two mechanisms that exempt, or that may exempt, certain bargaining unit employees from EO 14251's exclusion from Chapter 71 coverage.  Section 2 exempts from the exclusion "the immediate, local employing offices of any agency police officers, security guards, or firefighters, provided that this exclusion does not apply to the Bureau of Prisons."  *Id*. at § 2 (1-499(a)).  Section 4 purports to authorize the Secretaries of Defense and Veterans Affairs to further exempt from the Section 2 exclusion "any subdivisions of the departments they supervise" thereby restoring collective bargaining rights to those select subdivisions, if they certify that Chapter 71 "can be applied to [specific subdivisions] in a manner consistent with national security requirements and considerations."  *Id.* at § 4.

104.    The White House published a "Fact Sheet" alongside EO 14251, which called out affected unions as "dangerous" and described the CSRA as "enabl[ing] hostile Federal unions." The White House, Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements (Mar. 27, 2025) (https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-exempts-agencies-with-national-security-missions-from-federal-collective-bargaining-requirements/). The "Fact Sheet" also proclaimed that "[c]ertain Federal unions have declared war on President Trump's agenda" and warned that President Trump "will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security missions."  *Id.*

105.    On the same day that EO 14251 was issued, the Acting Director of the Office of Personnel Management ("OPM"), Charles Ezell, released a memorandum providing agency leadership guidance on how to implement EO 14251.  *See* Memorandum from Charles Ezell, *Guidance on Executive Order Exclusions from Federal Labor-Management Programs* (Mar. 27, 2025) ("OPM Guidance") (https://www.opm.gov/chcoc/latest-memos/guidance-on-executive-order-exclusions-from-federal-labor-management-programs/).

106.    The OPM Guidance stated that by operation of the exclusions ordered under EO
14251 "covered agencies and subdivisions are no longer subject to collective-bargaining
requirements of [C]hapter 71" and "[c]onsequently, those agencies and subdivisions are no
longer required to collectively bargain with Federal unions." *Id.* at 3.  The guidance further
advised excluded agencies that, pursuant to EO 14251, they "should not participate in further
grievance arbitration proceedings following termination of their CBAs." *Id.* at 5.

107.    The OPM Guidance emphasized that following EO 14251, labor organizations
acting as exclusive representatives for federal employees previously covered under Chapter 71
no longer have this status. *Id.* at 3.  Additionally, OPM explained that "employees no longer
have representational activities to conduct once their agency or subdivision has been excluded
from [Chapter 71] coverage," such that the EO 14251 "requires agencies to promptly return"
employees on official time to conduct representational work "to performing solely agency
business." *Id.* at 6.

108.    EO 14251, which relies on authority granted to the President under Chapter 71,
unilaterally and impermissibly strips IBEW Locals 640, 1002, 1245, 1759, 1959, 2159 and GCC-
1 and the DOE prevailing rate employees they represent of their rights to bargain collectively,
which is protected by Section 704.  By purporting to take away the right to bargain collectively
from DOE prevailing rate employees covered Section 9(b), EO 14251 is directly contrary to
Section 704.

**D.    Subdivisions within the DOE have recognized that EO 14251 is contrary to Section 704.**

109.    On July 29, 2025, in response to EO 14251, the Administrator and Chief
Executive Officer of WAPA sent a memorandum to Defendant Wright, Secretary of the DOE,
regarding the applicability of EO 14251 to the collective bargaining of wages and other working
conditions between WAPA and IBEW GCC-1 ("WAPA Memo").

25

3121541

110.    The WAPA Memo explains that WAPA's collective bargaining agreements with IBEW GCC-1 unions contain provisions that are protected under Section 704.

111.    The WAPA Memo explicitly states: "It is WAPA's position that it may continue to collectively bargain wages and other working conditions under Section 704" and requests that the DOE "[a]pprove WAPA's request to bargain with IBEW GCC-1 on unit pay adjustments and working conditions."

112.    WAPA also advised the DOE that the inability to bargain over subject matters protected by Section 704 could lead to "significant loss[es] of skilled labor" that "potentially put the [high voltage power] grid at risk and degrade the [DOE's] ability to meet public safety and national security interests, as well as execute on the Administration's energy agenda."

113.    In other words, the subdivision at DOE responsible for bargaining with Plaintiff IBEW GCC-1 concurs with Plaintiffs: EO 14251 is contrary to Section 704.

114.    WAPA is not the only agency subdivision to agree with Plaintiffs' position.  On June 24, 2025, BPA, which is another DOE power marketing administration like WAPA and SWPA, issued a Frequently Asked Questions sheet ("BPA FAQ Sheet") addressing EO 14251.

115.    The BPA FAQ Sheet expressly states that BPA hourly employees "are not covered by" EO 14251 "due to the preservation or grandfathering" of certain BPA employees' "bargaining rights under a previous law[,]" (*i.e.*, Section 704).

116.    Accordingly, BPA, like WAPA, has acknowledged that EO 14251 cannot dismantle the protections afforded by Section 704 to prevailing rate employees who are subject to Section 9(b).

**E.    President Trump issued Executive Order 14343 in retaliation for the IBEW's protected activity.**

117.    Following the issuance of EO 14251, various unions and their affiliates brought suits challenging EO 14251.

118.    For example, on July 29, 2025, a coalition of federal labor unions filed *American Federation of Labor and Congress of Industrial Organizations et al v. Trump et al.*, No. 25-cv-02445 in the United States District Court for the District of Columbia challenging EO 14251 as unconstitutional and in violation of the Administrative Procedure Act ("AFL-CIO Case").

119.    On August 21, 2025, the plaintiffs in the AFL-CIO Case filed an amended complaint, which added several IBEW-affiliated locals as plaintiffs.  The IBEW-affiliated locals acting as plaintiffs in the AFL-CIO Case, who are not parties to this case, serve as bargaining representatives for federal employees working at subdivisions of the Department of Defense. *See Am. Fed'n of Lab. and Cong. of Indus. Orgs. et al v. Trump et al.*, No. 25-cv-02445 (D.C. Cir.), Dkt. 25, ¶¶ 13-16.

120.    ***One week later***, on August 28, 2025, President Trump issued Executive Order 14343, entitled "Further Exclusions from the Federal Labor-Management Relations Program" ("EO 14343").  In it, he purported to add to the list of agencies excluded from Chapter 71 pursuant to his authority under Section 7103(b)(1).

121.    In particular, EO 14343 excluded "Units in the Bureau of Reclamation with primary responsibility for operating, managing, or maintaining hydropower facilities."  Exec. Order No. 14343, 90 Fed. Reg. 42683 (Aug. 28, 2025).  The OPM Guidance memorandum was then amended to apply to the agencies and subdivisions excluded in EO 14343 as well as in EO 14251.

122.    Each and every employee in the "Units in the Bureau of Reclamation with primary responsibility for operating, managing, or maintaining hydropower facilities" excluded by EO 14343 is represented by IBEW locals.  Indeed, EO 14343 targeted the remaining BOR employees represented by the IBEW whose collective bargaining rights had not already been eliminated by EO 14251.

123.    The targeted exclusion of BOR units with the primary responsibility for operating, managing, or maintaining hydropower facilities was intended to retaliate against IBEW for its litigation efforts.

27

124.    EO 14343, which relies on authority granted to the President under Chapter 71, unilaterally and impermissibly strips Plaintiffs IBEW Locals 77, 283, 611, 640, 1245, 1759, and 2159 and the BOR bargaining unit employees they represent of their rights to bargain collectively protected by Section 704.  By purporting to take away the right to bargain collectively from DOI hourly rate employees covered by Section 9(b), EO 14343 is directly contrary to Section 704.

125.    On September 3, 2025, IBEW International President Kenneth Cooper issued a statement in response to EO 14343.  Mr. Cooper criticized President Trump's "reckless actions aimed at silencing federal workers, stripping away their bargaining rights, and weakening the unions that defend them."  International Brotherhood of Electrical Workers, "IBEW Responds to President Trump's Labor Day Attacks on Federal Workers' Rights," (Sept. 3, 2025) (https://ibew.org/press-release/ibew-responds-to-president-trumps-labor-day-attacks-on-federal-workers-rights/).  Mr. Cooper emphasized IBEW's longstanding commitment to securing fair agreements for its members working for the federal government, protected by the CSRA, and affirmed that "[n]o political maneuver can erase that history or IBEW's presence in the public sector workplace."  *Id.*

**F.    The Executive Orders harm Plaintiffs.**

126.    Despite the fact that subdivisions within DOE have recognized that the Executive Orders do not overrule Section 704's protections, management at WAPA and SWPA and at BOR have nevertheless taken steps to stymie the collective bargaining process and dismantle the collective bargaining rights and relationships of Plaintiffs and their members, effectively terminating the CBAs between Plaintiffs and the agencies.

127.    <u>Wage increases</u>.  Wages are a subject of Section 704-protected bargaining for the WAPA and SWAPA local unions.  The unions and management typically negotiate an annual wage adjustment during the summer, with implementation occurring in October, when the federal fiscal year begins.  This year, in a break with long-standing practice, WAPA refused to

negotiate wage increases with IBEW Local Unions 640, 1245, 1759, 1959, and 2159 in the summer of 2025.  In violation of its obligations under the CBA to negotiate, WAPA management unilaterally decided on the annual wage adjustment.  Not only that, but DOE and WAPA have not implemented this unilateral wage adjustment nearly a month after it was supposed to go into effect.  Similarly, WAPA, in reliance on EO 14251, has failed to implement an agreed-upon wage increase related to overtime compensation.  For its part, SWPA has similarly failed to implement an annual wage adjustment that was supposed to come into effect in October 2025. SWPA has failed to engage in negotiations with IBEW Local Union 1002, which is particularly salient for IBEW Local Union 1002 as its current contract will expire next year.

128.    Official recognition.  WAPA has stated that it no longer recognizes any of the IBEW Local Unions.

129.    Failure to meet and confer.  The CBAs provide for various meet-and-confer or similar consultation rights and obligations.  Defendants have breached those obligations.  For example, WAPA has failed to engage in regular, CBA-mandated meetings with union representatives with IBEW Locals 640, 1245, 1759, 1959, and 2159.  All Labor Management Meetings have been cancelled, leading to a deterioration of industrial relations.  WAPA management has also refused to hold mandated "Impact and Implementation" discussions with the unions regarding changes to working conditions.  BOR management has similarly failed to engage in CBA-mandated conferences with IBEW Local Union 283.

130.    Grievances.  The CBAs provide the local unions the right to submit grievances against management.  The CBAs impose an obligation on management to participate in the grievance process and to abide by formal and informal resolutions of grievances.  WAPA management has refused to process any grievances, holding grievances submitted before and after EO 14251 in abeyance.  WAPA's refusal to take any action on grievances has stalled the unions' ability to resolve disputes and impacted union members' livelihoods.  For example, WAPA and the unions were navigating a grievance regarding when a line worker may be promoted to acting foreman in a foreman's absence, an issue that has significant implications for

29

compensation and workplace safety.  After EO 14251 was issued, WAPA management refused to participate in the grievance process, leading to continued confusion in the field and precluding employes from receiving compensation for work actually performed.  SWPA and BOR have also indicated they will not process any grievances, and they are holding grievances submitted before and after EO 14251 in abeyance.

131.    Discipline and *Weingarten* rights.  The CBAs generally provide that employees may have a union representative participate in disciplinary hearings and that management must inform an employee involved in a disciplinary action of their right to representation, the so-called "*Weingarten* rights."  Following the Executive Orders, WAPA management has prevented union representatives from participating in discipline proceedings.

132.    Official time and use of employer property.  The CBAs allow for "official time," which, in general, is authorization for union representatives to conduct union activity on official time (*i.e.*, paid).  The scope of allowable official time is bargained for and noted in the CBAs.  Similarly, the CBAs allow Plaintiffs some limited use of employer property for union activity, such as the use of meeting rooms or storage space.  Since the issuance of EO 14251, management at WAPA, SWPA, and BOR have prohibited Plaintiffs' officials from taking official time.  (The SWPA prohibitions on official time is virtually absolute.  The WAPA and BOR prohibitions are opportunistic; management allows the WAPA and BOR unions' representatives to use official time when doing so is in management's interest, such as when management needs union help to resolve an issue, but not to engage in other activity.)  In the same vein, management at all three agencies have stopped Plaintiffs from using employer property in connection with union activity.  These actions violate the CBAs and break long-standing practice.

133.    Dues deductions.  Union dues pay for union activity.  The WAPA CBA with IBEW Local Unions 640, 1245, 1759, 1959, and 2159 provides for automatic dues deductions from members paychecks, with the deductions then being remitted to the local unions.  WAPA is failing to honor its contractual obligations regarding dues deductions in at least three ways.

30

First, with respect to all members, WAPA is withholding and remitting dues at 2024 salary rates, meaning that for all of 2025, IBEW Local Unions 640, 1245, 1759, 1959, and 2159 have not received dues for the proportion of its members' salaries that are attributable to the annual salary increase that went into effect in October 2024.  Second, WAPA has failed to set up automatic dues deductions for members who joined the union shortly prior to March 2025, but whose dues deductions were not finalized at the time of EO 14251.  Third, WAPA has failed to set up automatic dues deductions for members who joined the union after the issuance of EO 14251.

## CLAIMS FOR RELIEF

### Count I

*(Violation of Chapter 71 of Title 5/Ultra vires)*

134.    Plaintiffs reallege and incorporate paragraphs 1 through 133 above by reference as if fully set forth herein.

135.    Pursuant to Section 704 of the CSRA, the scope and substance of collective bargaining rights of federal prevailing rate employees subject to Section 9(b) of the PSRA that existed as of August 19, 1972 are preserved "without regard to any provision" of Chapter 71 "to the extent that any such provision is inconsistent with" Section 704.

136.    In enacting Section 704, Congress explained that the provision exists to "preserve unchanged the scope and substance of the… collective bargaining relationship" between federal prevailing rate employees and the relevant government agencies that existed as of August 19, 1972 and "excludes these employees from the restrictions on the scope of collective bargaining" under Chapter 71.

137.    Plaintiffs are IBEW locals and one labor-management council, all of whom represent prevailing rate employees subject to Section 9(b) whose collective bargaining rights are preserved, without regard to any provision of Chapter 71, including Section 7103(b).  Indeed, the prevailing rate employees represented by Plaintiffs are "exclude[d] … from the restrictions on the scope of collective bargaining" set out in Chapter 71.

31

138.    Nonetheless and despite Section 704's clear protection for the collective bargaining rights of federal prevailing rate employees subject to Section 9(b), the Executive Orders purport to invoke 5 U.S.C. § 7103 to exclude numerous agencies and subdivisions from coverage under Chapter 71, thereby purporting to relieve these agencies of their collective bargaining obligations.  As it relates to prevailing rate employees subject to Section 9(b), the Executive Orders are thus contrary to Section 704.

139.    Insofar as the Executive Orders breach or terminate the collective bargaining agreements of federal prevailing rate employees subject to Section 9(b) of the PSRA, like the employees represented by Plaintiffs, they violate Section 704 of the CSRA, which preserves the collective bargaining rights of these very employees notwithstanding any restriction in Chapter 71.

140.    Because EO 14251 and EO 14343 are contrary to Section 704 of the CSRA, go beyond the Executive's constitutional authorities, and are authorized by no statute, they are *ultra vires* and void.

## Count II

*Violation of the First Amendment (Retaliation)*

141.    Plaintiffs reallege and incorporate paragraphs 1 through 140 above by reference as if fully set forth herein.

142.    The First Amendment to the United States Constitution protects against government actions "abridging the freedom of speech" and "the right of the people … to petition the Government for a redress of grievances."

143.    The IBEW International exercised its First Amendment right to engage in political activity by publicly supporting President Joe Biden's campaign for re-election in 2024, and opposing Defendant Trump's campaign.  After President Biden announced he was dropping out of the race, the IBEW International again exercised its First Amendment right to engage in political activity by publicly supporting Vice President Kamala Harris's presidential campaign.

32

Shortly after President Trump's re-election, the IBEW International reaffirmed its commitment to fight back against Trump administration policies that were anti-union.

144.    Plaintiffs exercised their First Amendment rights by associating with and supporting the IBEW International, including by supporting its endorsement of President Biden and Vice President Harris, and its commitment to fight the Trump administration's anti-union policies.  Plaintiffs and their members further exercised their First Amendment right to associate by engaging in union activity, by advocating for their members and the employees they represent, and by bargaining collectively with the government.

145.    In direct response to this First Amendment protected activity, Defendants retaliated against the IBEW International and Plaintiffs, their members and the employees they represent, by issuing and implementing EO 14251, which purports to eliminate their status as exclusive representatives for a substantial number of federal employees and to exclude those employees from federal labor law protection.

146.    The Fact Sheet accompanying the EO 14251 confirms that the President issued the Order because of the IBEW International and Plaintiffs' First Amendment protected activity. The Fact Sheet concludes by stating, "President Trump *supports constructive partnerships with unions who work with him; he will not tolerate mass obstruction* that jeopardizes his ability to manage agencies with vital national security missions." (emphasis added).

147.    The IBEW-affiliated locals who joined the AFL-CIO Case against the Trump administration challenging EO 14251 exercised their First Amendment right to petition the government.  Plaintiffs exercised their First Amendment rights by associating with and supporting these locals

148.    In direct response and in close temporal proximity to that First Amendment protected activity, Defendants retaliated against IBEW locals, including Plaintiffs, their members and the employees they represent, by issuing and implementing EO 14343, which targets IBEW locals that had not been affected by EO 14251.  EO 14343 targeted Plaintiffs on the basis of their association with the IBEW-affiliated locals that sued the Administration.

33

149.    The elimination of the right to serve as exclusive representative, abrogation and breaches of contracts, and refusal to negotiate or honor past agreements serves to chill First Amendment protected conduct by a person of ordinary firmness.

150.    All Plaintiffs represent employees in agencies where the threat remains that additional bargaining rights will be stripped away.  Paired with the Fact Sheet's admonition that President Trump supports "unions who work with him," this encourages unions to refrain from voicing political views critical of the Trump administration, or else face the elimination of their representation rights and membership.

151.    Because EO 14251 and EO 14343 were issued in retaliation for First Amendment Protected activity, they should be permanently enjoined.

## Count III

### *Violation of the Fifth Amendment (Procedural Due Process)*

152.    Plaintiffs reallege and incorporate paragraphs 1 through 151 above by reference as if fully set forth herein.

153.    The Due Process Clause of the Fifth Amendment to the United States Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property without due process of law." U.S Const. amend. V.

154.    EO 14251 and EO 14343 interfere with and impair Plaintiffs' liberty and property interests protected by the Due Process Clause.

155.    "Valid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States.  Rights against the United States arising out of a contract with it are protected by the Fifth Amendment." *Lynch v. United States*, 292 U.S. 571, 579 (1934).

156.    Chapter 71 provides that federal collective bargaining agreements (CBAs) "shall be binding on the agency and the exclusive representative subject to the provisions of this chapter."  5 U.S.C § 7114(c)(3).

3121541

157.    By issuing and implementing EO 14251 and EO 14343, Defendants have deprived Plaintiffs of their constitutionally protected property interests in their CBAs by, for example, failing to negotiate wages, failing to negotiate new CBAs, failing to process grievances, and failing to permit employees union representation in disciplinary proceedings.

158.    Due process "requires, at the least, that an affected party be informed of the official action, be given access to the unclassified evidence on which the official actor relied[,] and be afforded an opportunity to rebut that evidence." *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 319 (D.C. Cir. 2014) (citing *Greene v. McElroy*, 360 U.S. 474, 496 (1959)). Nor does "a substantial interest in national security," constitute an excuse for "the failure to provide notice of, and access to, the unclassified information" underlying the decision. *Id.* at 320.

159.    No compelling government interest justified the President's failure to provide Plaintiffs due process under the Constitution.  Moreover, the decision to issue EO 14251 and EO 14343 was based on improper purposes.  Among other improper purposes, the Executive Orders were adopted for retaliatory reasons to punish Plaintiffs for exercising rights protected by the First Amendment.  This improper purpose and absence of any legitimate justification demonstrates that the Executive Orders are an abusive, irrational abuse of power that shocks the conscience, such that it could not be justified by any level of process.

160.    Because EO 14251 and EO 14343 were issued based on an improper purpose without giving Plaintiffs notice, the underlying unclassified evidence supporting the President's determination, or an opportunity to rebut that evidence, the Executive Orders should be enjoined.

## Count IV

*Violation of the Fifth Amendment (Abrogation of Property Rights in Federal Contract)*

161.    Plaintiffs reallege and incorporate paragraphs 1 through 160 above by reference as if fully set forth herein.

35

162.    "The United States are as much bound by their contracts as are individuals.  If they repudiate their obligations, it is as much repudiation, with all the wrong and reproach that term implies, as it would be if the repudiator had been a State or a municipality or a citizen." *Lynch*, 292 U.S. at 580 (quoting *The Sinking Fund Cases*, 99 U.S. 700, 719 (1878)).

163.    By enacting Section 704, Congress authorized Plaintiffs to form binding contracts that created protected property interests, and "the due process clause prohibits the United States from annulling them, unless, indeed, the action taken falls within the federal police power or some other paramount power."  *Id.* at 579.

164.    By issuing and implementing EO 14251 and EO 14343, Defendants have declared that they must no longer honor valid and binding contracts they entered into with Plaintiffs. Further, by issuing and implementing EO 14251 and EO 14343, Defendants have breached Plaintiffs' CBAs in numerous ways, including by failing to negotiate wages, failing to negotiate new CBAs, failing to process grievances, and failing to permit employees union representation in disciplinary proceedings.

165.    EO 14251 and EO 14343 purport to end the collective bargaining rights that Plaintiffs and their members hold.  Further, Defendants have deprived Plaintiffs and their members of some rights under the CBAs.  In this way, Defendants have deprived Plaintiffs and their members of property interests, and the Executive Orders violate the Fifth Amendment and should be enjoined.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter orders:

A.    Declaring that the Executive Orders are ultra vires, in violation of Section 704 and the First and Fifth Amendments to the U.S. Constitution;

B.    Enjoining Defendants and all their officers, employees, contractors, and agents from implementing or otherwise giving effect to the Executive Orders and the OPM Guidance

with respect to Plaintiffs and the federal prevailing rate employees they represent who are protected by Section 704 of the Civil Service Reform Act of 1978;

     C.       Awarding Plaintiffs reasonable attorney's fees and costs incurred; and

     D.       Providing such further relief as the Court may deem just and proper.


Respectfully submitted,
KEKER, VAN NEST & PETERS LLP

Dated: October 30, 2025


By:    */s/ Laurie Carr Mims*
       Brook Dooley *(pro hac vice pending)*
       Laurie Carr Mims (D.C. Bar #487732)
       Travis Silva *(pro hac vice pending)*
       Claire Bonelli *(pro hac vice pending)*
       Elizabeth Heckmann *(pro hac vice pending)*
       633 Battery Street
       San Francisco, CA 94111-1809
       Telephone:  415 391 5400
       Facsimile:  415 397 7188
       BDooley@keker.com
       LMims@keker.com
       TSilva@keker.com
       CBonelli@keker.com
       EHeckmann@keker.com

       *Attorneys for International Brotherhood of Electrical Workers*

3121541