IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, GOVERNMENT COORDINATING COUNCIL 1, et al. | Case No. 1:25-cv-03826-PLF |
| *Plaintiffs,* | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| DONALD J. TRUMP, et al. | |
| *Defendants.* | |

TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................................1

II.    BACKGROUND ...................................................................................................2

    A.     Plaintiffs represent federal prevailing rate employees who have bargained collectively with Department of the Interior and the Department of Energy since before August 19, 1972...................................................................2

        1.     Plaintiffs that Represent BOR Employees ...................................................4

        2.     Plaintiffs that Represent Both BOR and WAPA Employees.......................5

        3.     Plaintiff that Represents WAPA Employees ...............................................6

        4.     Plaintiff that Represents SWPA Employees ................................................7

    B.     Congress implemented a statutory scheme to protect the collective bargaining rights of the federal prevailing rate employees represented by Plaintiffs. ...........................................................................................7

        1.     Section 9(b) of the PRSA codified the collective bargaining rights of federal prevailing rate employees who had historically negotiated the terms and conditions of their employment. ........................7

        2.     The CSRA codified a general framework for collective bargaining for all federal employees in Chapter 71 of Title 5. ...................................9

        3.     Section 704 of the CSRA was enacted to protect the collective bargaining rights of federal prevailing rate employees covered by Section 9(b) of the PRSA...........................................................................10

    C.     The Executive Orders seek to bar the federal prevailing rate employees represented by Plaintiffs from bargaining collectively.............................15

        1.     Executive Order 14251 seeks to end collective bargaining for federal prevailing rate employees at WAPA and SWPA..........................15

        2.     Executive Order 14343 seeks to end collective bargaining for federal prevailing rate employees at the BOR. .........................................18

III.   LEGAL STANDARD...........................................................................................19

IV.    ARGUMENT .......................................................................................................19

    A.     The Executive Orders are *ultra vires* and contrary to Section 704.......................20

        1.     Section 704 obligates the government to bargain collectively with the federal prevailing rate employees represented by Plaintiffs. ..............22

        2.     Section 704 is a statutory command that is enforceable in an *ultra vires* action. ................................................................................................24

i

3.     The Executive Orders violate Section 704 by stripping all collective bargaining rights from the federal prevailing rate employees represented by Plaintiffs. ..........................................................25

B.     The Executive Orders violate Plaintiffs' First Amendment rights. ......................27

1.     Plaintiffs engaged in protected First Amendment activity. ......................28

2.     The Executive Orders are retaliatory actions against Plaintiffs................29

3.     There is a causal link between Plaintiffs' protected activity and the Executive Orders..........................................................................................29

V.     CONCLUSION..............................................................................................................31

# **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Am. Fed. Of Labor & Congress of Indus. Orgs. v. Trump*,
No. 1:25-cv-02445-PLF (D.D.C. filed July 29, 2025)..............................................................1

*Am. Fed'n of Gov't Emps., AFL-CIO v. Noem*,
785 F. Supp. 3d 833 (W.D. Wash. 2025)..................................................................................29

*Am. Fed'n of Gov't Emps., AFL-CIO v. Noem*,
No. C25-451 MJP, 2025 WL 2337222 (W.D. Wash. Aug. 13, 2025)....................................25

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
792 F. Supp. 3d 985 (N.D. Cal. 2025) ...............................................................................25, 30

*Am. Fed. Of State, Cnty, & Municipal Emps. v. Trump*,
No. 1:25-cv-03306-PLF (D.D.C. filed Sept. 19, 2025) ...........................................................1

*Am. Foreign Serv. Ass'n v. Trump*,
783 F. Supp. 3d 248 (D.D.C. 2025)..........................................................................18, 25, 30

*Am. Forest Res. Council v. United States*,
77 F.4th 787 (D.C. Cir. 2023)................................................................................................20

*American Federation of Labor and Congress of Indus. Orgs. et al. v. Trump et al.*,
No. 25-cv-02445-PLF (D.D.C. July 29, 2025) ................................................................18, 30

*Ariz. Students' Ass'n v. Ariz. Bd. Of Regents*,
824 F.3d 858 (9th Cir. 2016) .................................................................................................29

*BEG Investments, LLC v. Alberti*,
144 F. Supp. 3d 16 (D.D.C. 2015)..........................................................................................31

*Chamber of Com. of U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996)................................................................................................20

*Columbia Power Trades Council v. U.S. Dep't of Energy*,
671 F.2d 325 (9th Cir. 1982) .................................................................................................12

*Dep't of the Interior*,
B-191520, 1978 WL 9813 (June 6, 1978) ...............................................................................12

*Eu v. San Francisco Cnty. Democratic Cent. Comm.*,
489 U.S. 214 (1989)................................................................................................................28

*Fed. Educ. Ass'n v. Trump*,
　795 F. Supp. 3d 74 (D.D.C. 2025) ............................................................... *passim*

*Fed. Educ. Assoc. v. Trump*,
　No. 1:25-cv-01362-PLF (D.D.C. filed May 5, 2025) ............................................1

*Heffernan v. City of Paterson, N.J.*,
　578 U.S. 266 (2016) ........................................................................................30

*Holcomb v. Powell*,
　433 F.3d 889 (D.C. Cir. 2006) .......................................................................19

*Jenner & Block LLP v. U.S. Dep't of Just.*,
　784 F. Supp. 3d 76 (D.D.C. 2025) ..........................................................28, 30, 31

*Leedom v. Kyne*,
　358 U.S. 184 (1958) ...................................................................................21, 24

*Media Matters for Am. v. Paxton*,
　138 F.4th 563 (D.C. Cir. 2025) ...................................................................28, 29

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
　526 U.S. 172 (1999) ........................................................................................20

*Nat'l Ass'n of Postal Supervisors v. United States Postal Serv.*,
　26 F.4th 960 (D.C. Cir. 2022) ...............................................................20, 24, 25

*Nat'l Rifle Ass'n of Am. v. Vullo*,
　602 U.S. 175 (2024) ........................................................................................28

*Nat'l Treasury Emps. Union v. Trump*,
　780 F. Supp. 3d 237 (D.D.C. 2025) ........................................................18, 25, 30

*Nat'l Treasury Emps. Union v. Trump*,
　No. 1:25-cv-00935-PLF (D.D.C. filed Mar. 31, 2025) ........................................1

*Nieves v. Bartlett*,
　587 U.S. 391 (2019) ........................................................................................27

*Nuclear Regul. Comm'n v. Texas*,
　605 U.S. 665 (2025) ........................................................................................21

*Ry. Lab. Executives' Ass'n v. Nat'l Mediation Bd.*,
　29 F.3d 655 (D.C. Cir.), *amended*, 38 F.3d 1224 (D.C. Cir. 1994) (en banc) ........................24

*Talbott v. United States*,
　775 F. Supp. 3d 283 (D.D.C. 2025) ...............................................................30

*U.S. Dep't of the Interior, Bureau of Reclamation Rio Grande Project v. Fed. Lab. Rels. Auth.*,
908 F.2d 570 (10th Cir. 1990) ...................................................................14

*U.S. Dep't of Interior, Bureau of Reclamation v. Fed. Lab. Rels. Auth.*,
23 F.3d 518 (D.C. Cir. 1994)......................................................................8

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952)..............................................................................20, 26

**Federal Statutes**

5 U.S.C. §§ 5341–5349 ........................................................................ *passim*

5 U.S.C. §§ 7101–7135 ........................................................................ *passim*

Civil Service Reform Act of 1978 ....................................................... *passim*

Government Prevailing Rate Systems Act of 1972 ....................................7

Prevailing Rate Systems Act of 1972 § 9(b)........................................ *passim*

Pub.L. No. 92-392, 86 Stat. 564 (1972)...................................7, 8, 22, 24

Pub.L. No. 95-454, 92 Stat. 111, 1218 (1978)................................... *passim*

**Rules**

Fed. R. Civ. P. 56(a) ...................................................................................19

**Regulations**

Executive Order 12171 .........................................................................15, 18

Executive Order 14251 ......................................................................... *passim*

Executive Order 14343 ......................................................................1, 18, 30

**Other Authorities**

124 Cong. Rec. 25 (1978) (statement of Rep. William D. Ford)...........12, 13

3 FLRA 12, *as amended by* 38 FLRA No. 78 .........................................14

H.R. Conf. Rep. No. 95-1717 (1978)....................................................11, 13

H.R. Rec. No. 126, 95th Cong., 2d Sess. 124 ...........................................8

H.R. Rep. No. 95-1403, 95th Cong., 2d Sess. 61-62 (1978) ................11, 24

*In re Dep't of Energy Sw. Power Adm'n and Int'l Bhd. of Elec. Workers, Local 1002*, 19 FSIP 017 (2019) ............................................................................14

*In re Dep't of the Interior U.S. Bureau of Reclamation Upper Colo. Region and Local 611, Int'l Bhd. of Elec. Workers*, 93 FSIP 43 (1993) ....................................14

## I.    INTRODUCTION

This case challenges two recent Executive Orders issued by President Donald J. Trump—Executive Order 14251 and Executive Order 14343—which rely on Section 7103(b)(1) of Chapter 71 of the Federal Service Labor-Management Relations Statute to eliminate collective bargaining rights for huge swaths of the federal workforce, including employees represented by the Plaintiffs here, nine local unions and a labor council of the International Brotherhood of Electrical Workers ("IBEW"). This Court is already familiar with these Executive Orders, having preliminarily enjoined one or both of them on *four* separate occasions.[1]

Plaintiffs here raise a distinct argument ripe for summary judgment not present in the other cases the Court has seen: The Executive Orders are *ultra vires* and contrary to law because they purport to eliminate the collective bargaining rights of a class of federal prevailing rate employees represented by Plaintiffs whose right to bargain collectively was specifically protected by Congress in Section 9(b) of the Prevailing Rate Systems Act of 1972 and then again in Section 704 of the Civil Service Reform Act of 1978. Indeed, the collective bargaining rights protected by Congress in Section 704 ***cannot*** be overridden by any contradictory provision of Chapter 71, including Section 7103(b)(1), the authority on which President Trump relied to issue the Executive Orders. There is no dispute that the Plaintiff IBEW Local Unions and the employees they represent are protected by Section 704, and there is no dispute that the Executive Orders are contrary to Section 704. Accordingly, the Court should grant summary judgment on Plaintiffs' *ultra vires* claim.

_____

[1] *See Nat'l Treasury Emps. Union v. Trump,* No. 1:25-cv-00935-PLF (D.D.C. filed Mar. 31, 2025); *Fed. Educ. Assoc. v. Trump*, No. 1:25-cv-01362-PLF (D.D.C. filed May 5, 2025); *Am. Fed. Of Labor & Congress of Indus. Orgs. v. Trump*, No. 1:25-cv-02445-PLF (D.D.C. filed July 29, 2025); *Am. Fed. Of State, Cnty, & Municipal Emps. v. Trump*, No. 1:25-cv-03306-PLF (D.D.C. filed Sept. 19, 2025).

There is also no dispute that President Trump issued Executive Orders 14251 and 14343 to retaliate against Plaintiffs, who exercised their First Amendment rights to support President Biden and Vice President Harris and oppose the Trump Administration's policies. Accordingly, the Executive Orders are unconstitutional retaliatory acts in violation of the First Amendment, and Plaintiffs are entitled to summary judgment on this claim as well.

## II.    BACKGROUND

### A.    Plaintiffs represent federal prevailing rate employees who have bargained collectively with Department of the Interior and the Department of Energy since before August 19, 1972.

Plaintiffs are nine IBEW Local Unions and the Government Coordinating Council ("GCC-1"). Plaintiff GCC-1 is the exclusive bargaining representative for Plaintiffs IBEW Local Unions 640, 1245, 1759, 1959, and 2159 and bargains on behalf of federal employees working at the Department of Energy's ("DOE") Western Area Power Administration ("WAPA"). Plaintiffs IBEW Local Unions 77, 283, 611, 640, 1245, 1759, and 2159 bargain on behalf of federal employees working at the Department of Interior's ("DOI") Bureau of Reclamation ("BOR"). Plaintiff IBEW Local Union 1002 bargains on behalf of federal employees working at DOE's Southwestern Power Administration ("SWPA").

BOR is the primary agency within the DOI that regulates energy policy and production by managing over 470 dams throughout the western United States. BOR is the second-largest producer of hydropower in the United States and operates 53 hydroelectric powerplants across a 17-state service region in the western United States that annually produce, on average, 40 billion kilowatt-hours of cost-based federal hydroelectric energy.[2]

---

[2] United States Department of Energy, Bureau of Reclamation, https://www.usbr.gov/main/about/ (last accessed December 18, 2025).

WAPA and SWPA are two of the DOE's four Power Marketing Administrations responsible for selling electrical output from federally owned and operated hydroelectric dams.[3] The four agencies "span[] 34 states and suppl[y] power to various regions throughout the country" and provide critical sources of energy and grid stabilization within the DOE.[4] WAPA is responsible for marketing and delivering hydroelectric power generated at 57 hydropower plants across a 15-state service area in the central and western United States.[5] SWPA markets and delivers hydroelectric power generated at 24 hydropower dams across a 6-state service area in the southwestern United States.[6]

Plaintiffs IBEW Local Unions 77, 283, 611, 640, 1245, 1759, and 2159 represent and bargain on behalf of approximately 620 federal employees who work for the BOR. Undisputed Material Facts ("UMF") 1, 8, 14, 20, 31, 43, and 58. Plaintiffs IBEW Local Unions 640, 1245, 1759, 1959, and 2159, and GCC-1 represent and bargain on behalf of approximately 416 federal employees who work for WAPA. UMF 25, 37, 52, 63, and 69. Plaintiff IBEW Local Union 1002 represents and bargains on behalf of 68 federal employees who work for SWPA. UMF 75. The employees represented by the Plaintiffs IBEW Local Unions and GCC-1 work in a variety of recognized trades and crafts, including as craftsmen, pipefitters, mechanics, utilitymen, dam tenders, heavy equipment mechanics, converter technicians, hydroelectric operators, irrigation system mechanics, electricians, linemen, heavy equipment operators, protection and

---

[3] United States Department of Energy, https://www.energy.gov/power-marketing-administrations (last accessed December 18, 2025).

[4] *Id*.

[5] Western Area Power Administration, https://www.wapa.gov/about-wapa/ (last accessed December 18, 2025).

[6] Southwestern Area Power Administration, https://www.energy.gov/swpa/southwestern-power-administration (last accessed December 18, 2025).

communication craftsmen, control center operators, powerplant operators, powerplant mechanics, and powerplant electricians. UMF 1, 8, 14, 20, 25, 31, 37, 43, 52, 58, 63, and 75. As such, the employees represented by Plaintiffs are "prevailing rate" employees, a category of federal employees who perform trade or craft work. *See* 5 U.S.C. § 5342.[7]

Plaintiffs and the employees they represent have long collective bargaining histories with the BOR, WAPA, and SWPA. As detailed below, starting well before August 19, 1972—and in some cases as early as the 1940s and 1950s—each of the Plaintiffs and the federal employees they represent have bargained collectively with the federal government over a wide range of terms and conditions of employment and other employment benefits.

### 1.    Plaintiffs that Represent BOR Employees

**IBEW Local Union 77** represents approximately 194 federal employees who work at the Grand Coulee Power and Columbia Cascade Area offices of the BOR. UMF 1. IBEW Local Union 77 has been negotiating with the BOR over the terms and conditions of employment and other employment benefits, including work hours, rates of pay, adjustment of grievances, and the establishment of a Joint Cooperative Committee since at least 1949. UMF 2. IBEW Local Union 77 and the BOR entered into a collective bargaining agreement on April 27, 1949. UMF 3

**IBEW Local Union 283** represents approximately 48 federal employees who work for the BOR. UMF 8. IBEW Local Union 283 has been negotiating with the BOR over the terms and conditions of employment and other employment benefits, including labor-management cooperation, adjustment of grievances, the rights of union representatives and shop stewards, safety and health, overtime, fringe benefits, and rates of pay since at least May 17, 1960. UMF 9.

---

[7] *See also* U.S. Office of Personnel Management "Facts About the Federal Wage System," *available at* https://www.opm.gov/policy-data-oversight/pay-leave/pay-systems/federal-wage-system/facts-about-the-federal-wage-system/  (last accessed December 18, 2025).

IBEW Local Union 283 and the BOR entered into a collective bargaining agreement on May 17, 1960. UMF 10.

**Plaintiff IBEW Local Union 611** represents approximately 17 federal employees who work for the BOR. UMF 14. IBEW Local Union 611 has been negotiating with the BOR over the terms and conditions of employment and other employment benefits, including rates of pay, the establishment of an employee-management cooperation, adjustment of grievances, and the rights of union representatives, and shop stewards since at least 1964. UMF 15. IBEW Local Union 611 and the BOR entered into a collective bargaining agreement on March 30, 1964. UMF 16.

### 2.    Plaintiffs that Represent Both BOR and WAPA Employees

**Plaintiff IBEW Local Union 640** represents approximately 23 federal employees who work for the BOR and approximately 78 federal employees who work for WAPA. UMF 20 and 25. IBEW Local Union 640 has been negotiating with the BOR and WAPA (and its predecessor) over the terms and conditions of employment and other employment benefits, including rates of pay, labor-management cooperation, adjustment grievances, and the rights of union representatives and shop stewards since at least 1951. UMF 21 and 27. IBEW Local Union 640 entered into a collective bargaining agreement with the BOR and with WAPA's predecessor on December 7, 1951. UMF 22 and 28.

**Plaintiff IBEW Local Union 1245** represents approximately 137 federal employees who work for the BOR and approximately 47 federal employees who work for WAPA. UMF 31 and 37. IBEW Local Union 1245 has been negotiating with the BOR and with WAPA (and its predecessor) over the terms and conditions of employment and other employment benefits, including rates of pay, labor-management cooperation, and adjustment of grievances since at

least 1952. UMF 32 and 39. IBEW Local Union 1245 entered into a collective bargaining

agreement with the BOR and with WAPA's predecessor on August 29, 1952. UMF 33 and 40.

**Plaintiff IBEW Local Union 1759** represents approximately 130 employees who work

for the Eastern Colorado / Wyoming Area and the Montana Area offices of the BOR and

approximately 89 employees who work for WAPA. UMF 43 and 52. Local 1759 (and its

predecessor) have been negotiating with the BOR and WAPA (and its predecessor) over the

terms and conditions of employment and other employment benefits, including rates of pay,

labor-management cooperation, adjustment of grievances, and the rights of union representatives

and shop stewards since at least 1960. UMF 44, 48, and 54. IBEW Local Union 1759's

predecessor entered a collective bargaining agreement with the Montana Area office of the BOR

and WAPA's predecessor on August 12, 1952, UMF 49, and IBEW Local Union 1759 entered

into a collective bargaining agreement with the Eastern Colorado / Wyoming Area office of the

BOR and WAPA's predecessor on September 29, 1960, UMF 45, 49, and 55.

**Plaintiff IBEW Local Union 2159** represents approximately 71 employees who work

for the Upper Colorado Region of the BOR and approximately 45 employees who work for

WAPA. UMF 58 and 63. IBEW Local Union 2159 has been negotiating with the BOR and

WAPA (and its predecessor) over the terms and conditions of employment and other

employment benefits, including rates of pay, employee-management cooperation, adjustment of

grievances, overtime, hours of work, and general working rules since at least 1965. UMF 59 and

65. IBEW Local Union 2159 entered into a collective bargaining agreement with the BOR and

WAPA's predecessor on January 8, 1965. UMF 60 and 66.

### 3.    Plaintiff that Represents WAPA Employees

**Plaintiff IBEW Local Union 1959** represents approximately 157 federal employees who

work for WAPA. UMF 69. IBEW Local Union 1959 and WAPA (and its predecessor) have been

negotiating over the terms and conditions of employment and other employment benefits including rates of pay, labor-management cooperation, adjustment of grievances, and the role of union representatives and shop stewards since at least 1952. UMF 71. IBEW Local Union 1959 and WAPA's predecessor entered into a collective bargaining agreement on August 12, 1952. UMF 72.

### 4. Plaintiff that Represents SWPA Employees

**Plaintiff IBEW Local Union 1002** represents approximately 68 federal employees who work for SWPA. UMF 75. IBEW Local Union 1002 has been negotiating with SWPA over the terms and conditions of employment and other employment benefits, including rates of pay, overtime, hours of work, classifications, and safety rules since at least 1962. UMF 76. IBEW Local Union 1002 and SWPA entered into a collective bargaining agreement on June 14, 1962. UMF 77.

### B. Congress implemented a statutory scheme to protect the collective bargaining rights of the federal prevailing rate employees represented by Plaintiffs.

In the 1970s, Congress enacted two pieces of legislation codifying collective bargaining rights for federal employees: the Government Prevailing Rate Systems Act of 1972 ("PRSA") and the Civil Service Reform Act of 1978 ("CSRA").

### 1. Section 9(b) of the PRSA codified the collective bargaining rights of federal prevailing rate employees who had historically negotiated the terms and conditions of their employment.

On August 19, 1972, Congress passed the PRSA, which created a class of federal "prevailing rate employees," defined as "individual[s] employed in or under an agency in a recognized trade or craft, or other skilled mechanical craft, or in an unskilled, semiskilled, or skilled manual labor occupation." Pub.L. No. 92-392, 86 Stat. 564 (1972), codified at 5 U.S.C. §§ 5341–5349; 5 U.S.C. § 5342(a)(2)(A). Prior to 1972, the method of determining wages for

such "prevailing rate" employees varied on an agency-by-agency basis. However, Congress recognized that, to attract and retain such trade and craft employees, it would need to standardize and maintain their rates of pay. *See* H.R. Rec. No. 126, 95th Cong., 2d Sess. 124, reprinted in Comm. on Post Off. and Civ. Serv., 96th Cong., Legislative History of the Civil Service Reform Act of 1978, at 815–816 (Comm. Print 1979). Thus, the PRSA provides that hourly wages for prevailing rate employees are to be calculated based on wages prevailing in the industry in which the employees work. *See* 5 U.S.C. § 5341.[8]

At the time the PRSA was enacted, a subset of the trade and craft employees at issue were already bargaining collectively with the government. In Section 9(b) of the PRSA, Congress sought to maintain and protect those relationships. Section 9(b) provides that the statute "shall not be construed to" (1) "abrogate, modify, or otherwise affect" any preexisting negotiated contract provision "pertaining to wages, the terms and conditions of employment, and other employment benefits"; (2) "nullify, curtail, or otherwise impair" the right of the parties to these contracts to "renew[], extend[], modify[], or improve[]" the provisions of these contracts, or replace them with new contracts; or (3) affect in any way any "agreement, arrangement, or understanding" that had been negotiated prior to the PRSA's enactment.[9] Pub.L. No. 92-392, 86 Stat. at 574. That is, Section 9(b) preserves the preexisting collective bargaining relationships and practices for prevailing rate employees who had engaged in collective bargaining prior to the PRSA's adoption, exempting them from the new federal prevailing-rate pay system. *See U.S.*

---

[8] By contrast, wages for most other civilian federal employees (*i.e.*, those employed in professional, administrative, technical, or clerical positions) are fixed by the Federal General Schedule. *See* U.S. Office of Personnel Management "General Schedule," *available at* https://www.opm.gov/policy-data-oversight/pay-leave/pay-systems/general-schedule/ (last accessed December 18, 2025).

[9] The full text of Section 9(b) is attached hereto as Appendix A.

*Dep't of Interior, Bureau of Reclamation v. Fed. Lab. Rels. Auth.,* 23 F.3d 518, 524 (D.C. Cir. 1994) ("We agree … sections 9(b) and 704 evince a clear congressional intent to preserve the collective bargaining status quo for prevailing rate employees.").

> **2.    The CSRA codified a general framework for collective bargaining for all federal employees in Chapter 71 of Title 5.**

In 1978, six years after enacting the PRSA, Congress broadly reformed the civil service when it passed the CRSA. A part of that statute, known as the Federal Service Labor-Management Relations Statute and codified at Chapter 71 of title 5 of the U.S. Code (hereinafter, "FSLMRS" or "Chapter 71"), established a comprehensive framework governing collective bargaining for federal government employees. 5 U.S.C. §§ 7101–35. The framework is based on Congress's determination that statutorily protecting "the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them … safeguards the public interest" and "contributes to the effective conduct of public business." *Id.* § 7101(a)(1)(A)–(B).

Under Chapter 71, employees have "the right to form, join, or assist any labor organization, or to refrain from any such activity, freely and without fear of penalty or reprisal" and "to engage in collective bargaining with respect to conditions of employment through representatives chosen by employees under this chapter." *Id.* § 7102. Once a labor organization is certified as an exclusive representative of a bargaining unit of federal employees, it is "entitled to act for, and negotiate collective bargaining agreements covering, all employees in the unit." *Id.* § 7114(a)(1). Chapter 71 mandates that covered agencies and labor organizations acting as exclusive representatives "meet and negotiate in good faith for the purposes of arriving at a collective bargaining agreement," which, if approved by the head of the agency, becomes binding on the agency and the exclusive representatives. *Id.* §§ 7114(a)(4), (c)(1), (c)(3).

Chapter 71 also provides for certain narrow exclusions to collective bargaining rights of federal employees. For example, bargaining units may not include "any employee engaged in intelligence, counterintelligence, investigative, or security work which directly affects national security." *Id.* § 7112(b)(6). Additionally, Congress granted the President the limited authority to exclude additional agencies or subdivisions from Chapter 71's coverage upon a determination that (1) "the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work" and (2) "the provisions of [Chapter 71] cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." *Id.* §§ 7103(b)(1)(A)–(B).

### 3. Section 704 of the CSRA was enacted to protect the collective bargaining rights of federal prevailing rate employees covered by Section 9(b) of the PRSA.

Chapter 71 provided a comprehensive framework for federal employee collective bargaining activity on a prospective basis. It also addressed how to apply this framework to already-existing collective bargaining relationships. Specifically, in Section 704, Congress reaffirmed and extended the savings clause of Section 9(b) of the PRSA. *See* Pub.L. No. 95-454, 92 Stat. 111, 1218 (1978), *codified at* 5 U.S.C. § 5343 note.[10] Section 704 keeps in place Section 9(b)'s protection of the historical collective bargaining rights of federal prevailing rate employees.

Section 704(a) provides that the "terms and conditions of employment and other employment benefits with respect to Government prevailing rate employees to whom [S]ection 9(b)...applies which were the subject of negotiation in accordance with prevailing rates and

---

[10] The full text of Section 704 is attached hereto as Appendix B.

practices prior to August 19, 1972, shall be negotiated…in accordance with the provisions of [S]ection 9(b).…***without regard to any provision of chapter 71*** of title 5…to the extent that any such provision is inconsistent with this paragraph." *Id.* (emphasis added). Section 704(b) provides that "[t]he pay and pay practices" relating to federal prevailing rate employees covered by Section 9(b) "shall be negotiated in accordance with prevailing rates and pay practices ***without regard to any provision of…chapter 71*** of title 5…to the extent that any such provision is inconsistent with this paragraph…" *Id.* (emphasis added). Section 704 thus provides that prevailing rate employees to whom Section 9(b) applies have the right to bargain collectively over any term or condition of employment or employment benefit that was the subject of negotiation prior to August 19, 1972, the date the PRSA was adopted, "without regard to any provision of … [C]hapter 71." *Id.*

Section 704's plain terms are reinforced by its legislative history. Section 704 was intended to preserve and protect the right to bargain collectively over "terms and conditions of employment," "other employment benefits," and "pay and pay practices." H.R. Conf. Rep. No. 95-1717 (1978).[11] The House Report on Section 704 explains that "[t]he committee intend[ed] that [Section 704] ***preserve unchanged the scope and substance of the existing collective bargaining relationship*** between the employees' representatives and the agencies involved." H.R. Rep. No. 95-1403, 95th Cong., 2d Sess. 61-62 (1978) (emphasis added).[12] Congress went on to state that, in order to preserve those relationships, Section 704 "***excludes these employees from the restrictions on the scope of collective bargaining under chapter 71***…" *Id.*

---

[11] Relevant excerpts of the House Conference Report from October 5, 1978, are attached hereto as Appendix C.

[12] Relevant excerpts of the Legislative History of the Civil Service Reform Act of 1978, are attached hereto as Appendix D.

Employees covered by Section 704, whose bargaining rights predate August 19, 1972, are therefore distinct from other federal prevailing rate employees working in recognized trades or crafts. For example, unlike other prevailing rate employees whose wages are adjusted "from time to time at the government's discretion," *see* 5 U.S.C. § 5341, the federal employees represented by Plaintiffs who are covered by Section 704 have the unique right to negotiate their wages on an ongoing and annual basis, as called for by their respective collective bargaining agreements, *see*, *e.g.*, Ex. B to Williams Decl. at Appendix B (IBEW Local Union 1245); Ex. M to Wollenburg Decl. at Supplementary Labor Agreement No. 3 (GCC-1); and Ex. B to Perkins Decl. at Article III, Section 3.2 (IBEW Local Union 1002).This has resulted in "some of the most stable and effective collective bargaining in the history of public employee labor relations." 124 Cong. Rec. 25, 25722 (1978) (statement of Rep. William D. Ford).[13]

Congress enacted Section 704 because it feared losing certain federal prevailing rate employees, particularly those in the DOI and DOE, to the private sector. *See* 124 Cong. Rec. 25, 25722 (1978) (statement of Rep. William D. Ford). Although Section 9(b) of the PRSA had attempted to address this concern, it had not been entirely successful. In fact, following the passage of Section 9(b), two Comptroller General decisions sought to limit its scope. *See, e.g.*, *Dep't of the Interior*, B-191520, 1978 WL 9813 (June 6, 1978) at *3. Congress responded by enacting Section 704 to invalidate these Comptroller General decisions and to remove any ambiguity about the scope of protections in Section 9(b). *See* 124 Cong. Rec. 25, 25722 (statement of Rep. William D. Ford); *see also Columbia Power Trades Council v. U.S. Dep't of Energy*, 671 F.2d 325, 328 n.10 (9th Cir. 1982). Section 704's purpose was to "preserve the

---

[13] Relevant excerpts of the Congressional Record from August 11, 1978, are attached hereto as Appendix E.

scope of collective bargaining" for prevailing rate employees and provide "specific statutory authorization for the negotiation of wages, terms and conditions of employment and other employment benefits traditionally negotiated by th[ose] employees in accordance with prevailing practices in the private sector of the economy." *See* 124 Cong. Rec. 25, 25722 (statement of Rep. William D. Ford); H.R. Rep. No. 95-1717, 95th Cong., 2d Sess. 159, reprinted in (1978) U.S. Code Cong. & Ad. News 2893.

In the collective bargaining agreements they have negotiated with Plaintiffs, the DOI and DOE have admitted that Section 9(b) of the PRSA and Section 704 protect Plaintiffs and the prevailing rate employees they represent. UMF 4, 7, 12, 24, 30, 41, 42, 47, 51, 57, 62, 68, 74, and 79. For example, in the current collective bargaining agreement between IBEW Local Union 1245 and the BOR, dated August 1, 2023, the BOR admits that "[t]he rates of pay to be paid to the employees covered by this Agreement shall be determined through the process of collective bargaining" and that "[a]ll rates must be established … in accordance with Section 704 of Public Law 95-454 (Civil Service Reform Act of 1978) and Public Law 92-392(9)(a) and (b) (Prevailing Rates System Act of 1972)." UMF 36. Similarly, the current collective bargaining agreement between IBEW Local Union 1002 and SWPA states the parties entered into the agreement "[i]n accordance with the provisions of Title VII, section 704, of the [CSRA]." UMF 80. And the current collective bargaining agreement between IBEW Local Union 283 and the BOR dated November 24, 2021, is explicit that it is "authorized under Sec. 704, Civil Service Reform Act of 1978." UMF 13.

The DOI and DOE have made similar admissions in negotiations. UMF 11, 23, 29, 34, 41, 46, 50, 56, 61, 67, 73, and 78. In some cases, the admissions have been explicit. For example, in connection with contract negotiations in August 2025, a Labor Relations representative for the

BOR explicitly admitted that employees represented by IBEW Local Union 611 "are covered by Section 9(b) of Public Law 92-392 and Section 704 of Public Law 95-454." UMF 19. For that reason, the BOR agreed to "negotiate prevailing rates of pay" for employees represented by IBEW Local Union 611 "based [on] prevailing rates and practices of companies within the local geographic area." *Id.* In other cases, the admissions have been implicit. For example, during contract negotiations between the BOR and IBEW Local Union 283 in 2021, the BOR never contested that Section 704 requires that the BOR negotiate certain terms and conditions of employment and other employment benefits with IBEW Local Union 283 because those terms and conditions of employment and other employment benefits were the subject of negotiation prior to August 19, 1972. UMF 11.

Courts and administrative tribunals have likewise recognized that the employees represented by Plaintiffs are federal prevailing rate employees protected by Section 704 and that the BOR, WAPA and SWPA are thus required to bargain collectively with Plaintiffs over a wide array of terms and conditions of employment and other employment benefits. *See, e.g.*, *U.S. Dep't of the Interior, Bureau of Reclamation Rio Grande Project v. Fed. Lab. Rels. Auth.,* 908 F.2d 570, 571-72 (10th Cir. 1990) (recognizing IBEW Local Union 611 as the representative of prevailing rate employees under Section 9(b) protected by Section 704); Ex. L to Wollenburg Decl. (3 FLRA 12, *as amended by* 38 FLRA No. 78 (designating IBEW Local Unions 640, 1759, 1959, 2159, and 1245 as the exclusive representative of the employees protected by Section 704)); *In re Dep't of Energy Sw. Power Adm'n and Int'l Bhd. of Elec. Workers, Local 1002*, 19 FSIP 017 (2019) (Federal Impasse Panel acknowledging SWPA's agreement that Section 704 applied to employees represented by IBEW Local Union 1002, and that SWPA was required to bargain over pay rates); *In re Dep't of the Interior U.S. Bureau of Reclamation Upper Colo.*

*Region and Local 611, Int'l Bhd. of Elec. Workers*, 93 FSIP 43 (1993) (Federal Impasse Panel recognizing that employees represented by IBEW Local Union 611 are covered by Section 704).

### C. The Executive Orders seek to bar the federal prevailing rate employees represented by Plaintiffs from bargaining collectively.

#### 1. Executive Order 14251 seeks to end collective bargaining for federal prevailing rate employees at WAPA and SWPA.

On November 19, 1979, President Jimmy Carter issued Executive Order 12171, entitled "Exclusions From the Federal Labor-Management Relations Program" ("Executive Order 12171"). UMF 81. In Executive Order 12171, President Carter, citing 5 U.S.C. § 7103(b)(1), determined that certain listed agency subdivisions had, as their primary function, "intelligence, counterintelligence, investigative, or national security work" and that the provisions of Chapter 71 governing collective bargaining rights of federal employees could not be applied to those agency subdivisions "in a manner consistent with national security requirements end considerations." UMF 82. Executive Order 12171 directed that the agency subdivisions set forth in the Order "are hereby excluded from coverage under Chapter 71." UMF 83.

On March 27, 2025, President Donald J. Trump issued Executive Order 14251, also entitled "Exclusions from Federal Labor-Management Relations Programs" ("Executive Order 14251"). UMF 84. In Executive Order 14251, President Trump amended President Carter's Executive Order 12171 to add numerous federal agencies—including the entirety of the Departments of Justice, State and Veterans Affairs—and agency subdivisions to be excluded from coverage under Chapter 71. UMF 85. Executive Order 14251 directed that, except for one subdivision, all of the DOE—including WAPA, SWPA and the other Power Marketing Administrations—be excluded from coverage under Chapter 71. UMF 86. As in President Carter's 1979 Executive Order, President Trump's Executive Order 14251 states that the agencies and subdivisions to be excluded "have a primary function intelligence,

15

counterintelligence, investigative, or national security work" and that "Chapter 71 of title 5 cannot be applied to these agencies and agency subdivisions in a manner consistent with national security requirements and considerations." UMF 87. However, unlike President Carter's 1979 Order, Executive Order 14251 excludes from coverage under Chapter 71 agencies and subdivisions that lack any apparent connection to national security, such as the National Institute of Allergy and Infectious Diseases, the National Institutes of Health, the Bureau of Ocean Energy Management, and the Animal and Plant Health Inspection Service. UMF 88.

On the same day the Executive Order issued, the White House published a "Fact Sheet" about Executive Order 14251. UMF 89. The Fact Sheet begins by stating that, "Today, President Donald J. Trump signed an Executive Order … to end collective bargaining with Federal unions" in the agencies and subdivisions covered by the Executive Order. UMF 90. The Fact Sheet goes on to disparage collective bargaining and unions who advocate for their members and oppose the Administration's actions. It states that (a) collective bargaining rights provided by the FSLMRS "enable[] hostile Federal unions to obstruct agency management," which is "dangerous in agencies with national security responsibilities"; (b) "Certain Federal unions have declared war on President Trump's agenda"; and (c) "President Trump supports constructive partnerships with unions who work with him; he will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security missions." UMF 91–93.

The same day, the Acting Director of the Office of Personnel Management ("OPM") issued a memorandum to heads of departments and agencies providing guidance on implementing Executive Order 14251. UMF 94. The OPM memorandum instructs that the agencies and subdivisions covered by the Executive Order "are no longer subject to the

collective-bargaining requirements of chapter 71," and "those agencies and subdivisions are no longer required to collectively bargain with Federal unions." UMF 95.

Thus, by excluding the listed agencies and subdivisions from Chapter 71's coverage, Executive Order 14251 seeks to terminate collective bargaining rights for all federal employees working at those agencies and subdivisions, including the federal prevailing rate employees represented by Plaintiffs GCC-1 and IBEW Local Unions 640, 1245, 1759, 1959, and 2159 who work for WAPA and the federal prevailing rate employees represented by Plaintiff IBEW Local Union 1002 who work for SWPA. And Executive Order 14251 attempts to relieve the DOE and its subdivisions of their obligation to bargain collectively with these Local Unions and the employees they represent.

As a result of Executive Order 14251, WAPA and SWPA management have failed to adhere to their obligation to bargain and failed to honor existing obligations in their current collective bargaining agreements, including by failing to negotiate typical annual wage adjustments, canceling labor management meetings, and refusing to process grievances. UMF 109–110. For example, on October 15, 2025, the Acting Employee Service & Compensation Division Chief and Workplace Relations Branch Chief for WAPA refused to communicate directly with GCC-1 representatives regarding a personnel matter, stating that WAPA was "not currently recognizing the unions." UMF 107. Similarly, on November 19, 2025, the same WAPA manager stated that WAPA would not attend a labor management meeting mandated by the collective bargaining agreement between WAPA and GCC-1 because "the Executive Order is still in effect." UMF 108.

### 2. Executive Order 14343 seeks to end collective bargaining for federal prevailing rate employees at the BOR.

Many unions brought lawsuits to enjoin Executive Order 14251.[14] One of those lawsuits was *American Federation of Labor and Congress of Indus. Orgs. et al. v. Trump et al.,* No. 25-cv-02445-PLF (D.D.C. July 29, 2025) (the "AFL-CIO Case"), pending in this Court. On August 21, 2025, the plaintiffs in the AFL-CIO Case amended their complaint and added as plaintiffs several IBEW locals that represent federal employees at the Department of Defense. UMF 103.

On August 28, 2025—just seven days after IBEW local unions joined the AFL-CIO Case—President Trump issued Executive Order 14343, entitled "Further Exclusions from the Federal Labor-Management Relations Program" ("Executive Order 14343"). UMF 104. Executive Order 14343 further amended Executive Order 12171 to add to the list of agencies and subdivisions excluded from coverage under Chapter 71 "[u]nits in the Bureau of Reclamation with primary responsibility for operating, managing, or maintaining hydropower facilities." UMF 105. All the employees in the BOR units identified in Executive Order 14343 are represented by IBEW local unions. UMF 106. Like Executive Order 14251, Executive Order 14343 seeks to terminate collective bargaining rights for the prevailing rate employees at the BOR represented by Plaintiff Local Unions 77, 283, 611, 640, 1245, 1759, and 2159.

As with WAPA and SWPA, BOR management has refused to engage in the collective bargaining process and has disregarded its obligations under existing collective bargaining agreements as a result of Executive Order 14343. For example, after Executive Order 14343 was issued, BOR management discontinued its participation in the grievance process, refused to

---

[14] *See, e.g.*, *Nat'l Treasury Emps. Union v. Trump*, 780 F. Supp. 3d 237 (D.D.C. 2025); *Am. Foreign Serv. Ass'n v. Trump*, 783 F. Supp. 3d 248 (D.D.C. 2025); *Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74 (D.D.C. 2025).

provide IBEW Local Union 283 representatives official time for union activities, and cancelled all Labor Management Meetings with IBEW Local Union 283 in contravention of the collective bargaining agreement between IBEW Local Union 283 and the BOR. UMF 111.

## III.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "'The mere existence of some alleged factual dispute between the parties' will not defeat summary judgment; 'the requirement is that there be no genuine issue of material fact.'" *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law . . . An issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Holcomb,* 433 F.3d at 895 (quoting *Anderson*, 477 U.S. at 248).

## IV.   ARGUMENT

This case should be very simple to resolve. In the two Executive Orders at issue, the President invoked his authority under 5 U.S.C. § 7103(b)(1) to exclude Plaintiffs and the federal employees they represent from coverage under Chapter 71, which provides federal employees with the right to bargain collectively. However, in Section 704, Congress specifically protected the right of Plaintiffs and the employees they represent to bargain collectively over certain terms, conditions and benefits of employment, without regard to any provision of Chapter 71, which includes Section 7103(b)(1). Thus, as a matter of law, the President cannot terminate Plaintiffs' right to bargain collectively by invoking Section 7103(b)(1), and the Executive Orders cannot be applied to Plaintiffs and the employees they represent.

Alternatively, the record is clear that the President issued the two Executive Orders to retaliate against unions who oppose his political agenda, including Plaintiffs. As this Court has repeatedly found, the First Amendment prohibits that kind of governmental conduct, and summary judgment can be entered on that basis, as well.

### A.    The Executive Orders are *ultra vires* and contrary to Section 704.

It is "black letter law" that the President's authority to act "must stem either from an act of Congress or from the Constitution itself." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 188–89 (1999) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). Accordingly, an executive order is unconstitutional to the extent it "amounts to lawmaking, a legislative function which the Constitution has expressly confided to the Congress and not to the President." *Youngstown*, 343 U.S. at 582. The President cannot order "that a presidential policy be executed in a manner prescribed by President"; he may only "direct that a congressional policy be executed in a manner prescribed by Congress." *Id.* at 588. "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at [its] lowest ebb…." *Id.* at 637 (Jackson, J., concurring).

"The Congress can and often does cabin the discretion it grants the President[,] and it remains the responsibility of the judiciary to ensure that the President act[s] within those limits." *Am. Forest Res. Council v. United States*, 77 F.4th 787, 797 (D.C. Cir. 2023). Thus, "[w]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (quoting *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988)). "So long as a statutory provision plainly delineates the outer limits of agency authority and Congress has not expressly precluded judicial review, the provision may be susceptible to review for *ultra vires* acts that clearly violate its terms." *Nat'l Ass'n of Postal Supervisors v. United States Postal Serv.*, 26 F.4th 960, 971 (D.C. Cir.

20

2022); *see also Fed. Educ. Ass'n,* 795 F. Supp. 3d at 86–88 (this Court's application of *ultra vires* doctrine to different claims pertaining to EO 14251). *Ultra vires* review "applies only when an agency has taken action entirely 'in excess of its delegated powers and contrary to a specific prohibition' in a statute." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (quoting *Railway Clerks v. Association for Benefit of Non-contract Employees*, 380 U.S. 650, 660 (1965)); *see also Leedom v. Kyne*, 358 U.S. 184 (1958) (*ultra vires* review appropriate to constrain agency action in violation of a specific statutory prohibition).

Here, Congress has not authorized the President to terminate the collective bargaining rights of federal prevailing rate employees, to the extent those rights are protected by Section 9(b) of the PRSA and Section 704 of the CSRA. The plain language of Section 704 makes clear that federal prevailing rate employees covered by Section 9(b) of the PRSA have the right to negotiate the terms and conditions of their employment and other employment benefits, provided they were the subject of negotiation prior to August 19, 1972. § 704(a)–(b); 92 Stat. at 1218. Moreover, Section 704 makes clear that any right to bargain collectively that is protected by Section 9(b) is not subject to the limitations in Section 7103(b)(1). *Id.*

Contrary to this express protection, the Executive Orders exclude Plaintiffs and the federal prevailing rate employees they represent from coverage under Chapter 71, which grants federal employees the right to bargain collectively. Thus, the Executive Orders strip Plaintiffs and the employees they represent of *all* their collective bargaining rights—including the right to bargain collectively over terms and conditions of employment that were the subject of bargaining before August 19, 1972—based on the President's authority in Section 7103(b)(1). Accordingly, the Executive Orders, and their application to Plaintiffs, are *ultra vires* and contrary to Section 704.

1.    **Section 704 obligates the government to bargain collectively with the federal prevailing rate employees represented by Plaintiffs.**

Section 704 protects the rights of the federal prevailing rate employees represented by Plaintiffs to bargain collectively over the terms and conditions of their employment and other employment benefits. The statute provides that the "terms and conditions of employment and other employment benefits with respect to Government prevailing rate employees to whom [S]ection 9(b)…applies which were the subject of negotiation…prior to August 19, 1972, shall be negotiated…without regard to any provision of chapter 71 of title 5…" Pub.L. No. 95-454, 92 Stat. 111, 1218 (1978), *codified at* 5 U.S.C. § 5343 note. The federal prevailing rate employees represented by Plaintiffs fall squarely within Section 704's protections.

*First*, the federal employees Plaintiffs represent are prevailing rate employees. The PRSA defines "prevailing rate employee[s]" as "individual[s] employed in or under an agency in a recognized trade or craft…" 5 U.S.C. § 5342(a)(2)(A). The employees represented by Plaintiffs work in recognized trades and crafts, as, among other classifications, electricians, mechanics, and powerplant operators. UMF 1, 8, 14, 20, 25, 31, 37, 43, 52, 58, 63, and 75. These employees, who work in recognized trades and crafts, satisfy the definition of "prevailing rate employee" set forth in the PRSA. 5 U.S.C. § 5342.

*Second*, Section 9(b) of the PRSA applies to the federal prevailing rate employees Plaintiffs represent. Section 9(b) protects federal prevailing rate employees who, prior to August 19, 1972, had their wages and other terms and conditions of employment set through collective bargaining. *See* Pub.L. No. 92-392, 86 Stat. at 574. The federal employees represented by Plaintiffs meet this standard. Indeed, all the Plaintiff IBEW Locals have been negotiating over the terms and conditions of employment with their respective federal employers since before August 19, 1972, the date of the enactment of the PRSA. UMF 2, 9, 15, 21, 27, 32, 39, 44, 48,

54, 59, 65, 71, 76. Moreover, the BOR, WAPA and SWPA have admitted that Section 9(b) applies to the Plaintiff IBEW Locals. UMF 29, 41, 46, 50, 56, 61, 67, 73, and 78. Accordingly, there is no dispute that these employees fall within the scope of Section 9(b) of the PRSA.

*Third*, Plaintiffs and the federal prevailing rate employees they represent have been negotiating over a wide array of terms and conditions of their employment and other employment benefits since prior to August 19, 1972. UMF 2, 9, 15, 21, 27, 32, 39, 44, 48, 54, 59, 65, 71, 76. IBEW Local Union 77, for example, has been negotiating with the BOR over terms, conditions, and benefits, including work hours, rates of pay, adjustment of grievances, and the establishment of a Joint Cooperative Committee since at least 1949. UMF 2. And IBEW Local Union 640 has been negotiating with the BOR over similar terms and conditions of employment since at least 1951. UMF 21.

Moreover, the DOI and DOE have admitted that Section 704 protects the right of the federal prevailing rate employees represented by Plaintiffs to bargain collectively over the terms and conditions of their employment, notwithstanding any other provision of Chapter 71. The collective bargaining agreements between the Plaintiff Local Unions and Defendants expressly acknowledge that the Local Unions are protected by Section 704. UMF 4, 7, 12, 24, 30, 35, 42, 47, 51, 57, 62, 68, 74, and 79. And BOR, WAPA, and SWPA representatives have admitted— explicitly and implicitly—in bargaining that Section 704 requires the BOR, WAPA, and SWPA to negotiate certain terms and conditions of employment and other employment benefits with the Local Unions because those terms, conditions and benefits were the subject of negotiation prior to August 19, 1972. UMF 11, 23, 29, 34, 41, 46, 50, 56, 61, 67, 73, and 78. Courts, the Federal Labor Relations Authority ("FLRA") and other administrative bodies have likewise recognized that Plaintiffs fall within Section 704's protections. *See, supra* at 14–15. Accordingly, there is no

dispute that the BOR, WAPA and SWPA are required by Section 704 to continue to bargain with Plaintiffs and the prevailing rate employees they represent over the full range of terms and conditions of employment and other employment benefits protected by Section 704.

> **2.    Section 704 is a statutory command that is enforceable in an *ultra vires* action.**

A "challenged action" that "'contravene[s] a clear and specific statutory mandate'" is "susceptible to *ultra vires* review." *Nat'l Ass'n of Postal Supervisors v. United States Postal Serv.*, 26 F.4th 960, 971 (D.C. Cir. 2022) (quoting *Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*, 437 F.3d 1256, 1264 (D.C. Cir. 2006)). *Ultra vires* review "can apply in cases involving either negative or positive statutory commands." *Ry. Lab. Executives' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 662 (D.C. Cir.), *amended*, 38 F.3d 1224 (D.C. Cir. 1994) (en banc). Courts uphold *ultra vires* claims in cases where Congress used the word "shall" in stating the statutory mandate. *E.g.*, *Leedom*, 358 U.S. at 188; *Nat'l Ass'n of Postal Supervisors v. United States Postal Serv.*, 26 F.4th 960, 972 (D.C. Cir. 2022).

Both Section 9(b) and Section 704 contain clear, specific statutory mandates. The statutes use the term "shall," meaning that the language is mandatory. *See* Pub.L. No. 92-392, 86 Stat. at 574; Pub.L. No. 95-454, 92 Stat. 111, 1218 (1978), *codified at* 5 U.S.C. § 5343 note. Similarly, the "without any regard" language in Section 704 is clear and unambiguous: no provision of Chapter 71 can act to limit rights protected by Section 704. The legislative history of Section 9(b) and Section 704 confirms Congress's intent to protect bargaining relationships that existed as of August 19, 1972. *E.g.*, H.R. Rep. No. 95-1403, 95th Cong., 2d Sess. 61–62 (1978); *see generally*, *supra*, pp. 7–13 (detailing legislative history). These types of clear, legislative

commands are enforceable through *ultra vires* actions. *See Nat'l Ass'n of Postal Supervisors*, 26 F.4th at 972.[15]

### 3. The Executive Orders violate Section 704 by stripping all collective bargaining rights from the federal prevailing rate employees represented by Plaintiffs.

Executive Orders 14251 and 14343 work to terminate the collective bargaining rights of employees of the listed agencies and agency subdivisions. The plain text of the Orders directs that the employees at the BOR, WAPA and SWPA represented by Plaintiffs are "excluded from coverage under Chapter 71 of Title 5." UMF 86 and 105. Neither Executive Order contains an exception for federal employees protected by Section 704. Thus, the Executive Orders seek to prevent Plaintiffs from exercising *any* collective bargaining rights, including those specifically reserved for prevailing rate employees such as those represented by Plaintiffs in Section 704. But Section 704 requires the government to continue to engage in collective bargaining where the collective bargaining relationship arose before August 19, 1972. Plaintiffs have such collective bargaining relationships, so the Executive Orders cannot lawfully be applied to them.

Defendants have made clear that the Executive Orders were intended to take away all collective bargaining rights from every federal employee at the agencies and subdivisions

---

[15] While the FLRA has made determinations in the past regarding the scope of Section 704's protections in the context of a specific collective bargaining relationship, the FSLMRS's administrative review scheme is not available to Plaintiffs because the Executive Orders exclude the DOI and DOE from the FSLMRS's coverage, thereby divesting the FLRA of its jurisdiction. *See Am. Foreign Serv. Ass'n,* 783 F. Supp. 3d at 261; *Fed. Educ. Ass'n,* 795 F. Supp. 3d at 85; *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump,* 792 F. Supp. 3d 985, 999 (N.D. Cal. 2025). The government has previously conceded this point. *Nat'l Treasury Emps. Union,* 780 F. Supp. 3d at 250 ("[T]he government agreed that the FLRA likely would determine that it lacks jurisdiction over NTEU's case challenging [Executive Order 14251]"). Furthermore, even if the FLRA had jurisdiction, Plaintiffs' *ultra vires* and constitutional claims are not the type of labor disputes that Congress intended to be channeled to the FSLMRS. *See, e.g., Am. Fed'n of Gov't Emps., AFL-CIO v. Noem,* No. C25-451 MJP, 2025 WL 2337222, *5 (W.D. Wash. Aug. 13, 2025) ([T]he FLRA has a far narrower review mandate, principally designed to hear disputes about negotiability and unfair labor practices.").

identified in the Executive Orders. On the same day President Trump issued Executive Order 14251, the White House stated that the Order would "end collective bargaining with Federal unions" in the agencies and subdivisions covered by the Executive Order. UMF 90. The Acting Director of the OPM stated that the agencies and subdivisions covered by Executive Order 14251 "are no longer subject to the collective-bargaining requirements of chapter 71," and "are no longer required to collectively bargain with Federal unions." UMF 95. And, the agency Defendants have in fact stopped complying with Plaintiffs' collective bargaining agreements because of the Executive Orders. UMF 107–111. And nowhere have Defendants acted to preserve collective bargaining relationships protected by Section 704.

This is overreach. President Trump cannot invoke Section 7103(b)(1) to terminate Plaintiffs' collective bargaining relationships. Section 704 protects the collective bargaining rights of the federal prevailing rate employees represented by Plaintiffs "***without regard to any provision of…chapter 71***." Pub.L. No. 95-454, 92 Stat. 111, 1218 (1978), *codified at* 5 U.S.C. § 5343 note (emphasis added). Section 7103 is part of Chapter 71, so whatever power the President has under Section 7103(b)(1)—and it is the scope of that power that is the subject of most of the other litigation over Executive Orders 14251 and 14343—that provision cannot be used to terminate the collective bargaining rights of these Plaintiffs because they are protected by Section 704. Because the Executive Orders are "incompatible with the expressed…will of Congress," *Youngstown*, 343 U.S. at 637, they are *ultra vires* and unlawful.

Even the agencies agree with Plaintiffs' reading of the law. After the President issued Executive Order 14251, the Administrator and Chief Executive Officer of WAPA sent a memorandum to Defendant Wright, Secretary of the DOE, regarding the applicability of Executive Order 14251 to the collective bargaining of wages and other working conditions

between WAPA and IBEW GCC-1. UMF 97. The WAPA memorandum states that WAPA's
collective bargaining agreement with GCC-1 unions contain provisions that are protected under
Section 704. UMF 98. In fact, according to the WAPA memorandum, "[i]t is WAPA's position
that it may continue to collectively bargain wages and other working conditions under Section
704." UMF 99. WAPA thus requested that the DOE "[a]pprove WAPA's request to bargain with
IBEW GCC-1 on unit pay adjustments and working conditions." UMF 100.

The Bonneville Power Administration ("BPA"), another Power Marketing
Administration like WAPA and SWPA, also recognized that Executive Order 14251 conflicts
with Section 704. On June 24, 2025, BPA issued a Frequently Asked Questions sheet addressing
Executive Order 14251. UMF 101. The BPA FAQ sheet states that BPA hourly employees "are
not covered by" Executive Order 14251 "due to the preservation or grandfathering" of certain
BPA employees' "bargaining rights under the previous law" (*i.e.*, Section 704). UMF 102. These
memos evince the agencies' consistent practice of applying Section 704 to its negotiations with
Plaintiffs and reflect their understanding that the Executive Orders cannot dismantle the
protections afforded by Section 704.

Executive Orders 14251 and 14343 impermissibly exceed—and are directly contrary to—
the clear limits Congress placed on the President's authority when it enacted Section 704.
Accordingly, the Executive Orders are *ultra vires*, contrary to law, and void as applied to
Plaintiffs and the federal prevailing rate employees they represent.

**B.    The Executive Orders violate Plaintiffs' First Amendment rights.**

The Executive Orders are also unlawful retaliation for Plaintiffs' protected First
Amendment speech. "[T]he First Amendment prohibits government officials from subjecting an
individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S.
391, 398 (2019) (internal quotations omitted). Moreover, a government official cannot "use the

power of the State to punish or suppress disfavored expression." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024). "Litigation itself is a form of expression protected by the First Amendment." *Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 94 (D.D.C. 2025) (quoting *In re Halkin*, 598 F.2d 176, 187 (D.C. Cir. 1979)).

Government action constitutes First Amendment retaliation where a plaintiff (1) "engaged in conduct protected under the First Amendment," (2) the government "took some retaliatory action sufficient to deter a person of ordinary firmness in [the plaintiff's] position from speaking again," and (3) there is "a causal link between the exercise of a constitutional right and the adverse action taken." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 584 (D.C. Cir. 2025) (citing *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016)). Here, there is no dispute that the Executive Orders constitute retaliation in violation of the First Amendment.

### 1.    Plaintiffs engaged in protected First Amendment activity.

Plaintiffs unquestionably engaged in activity protected by the First Amendment, including making political endorsements and publicly opposing the Trump administration's policies. *See Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989) ("[T]he First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office."). Prior to the issuance of Executive Order 14251, the IBEW publicly supported President Joe Biden's campaign for re-election in 2024 and opposed Defendant Trump's campaign. UMF 112. Then, after President Biden announced he was dropping out of the race, the IBEW publicly supported Vice President Kamala Harris's presidential campaign. UMF 113. And shortly after President Trump's re-election, the IBEW publicly affirmed its opposition to certain Trump Administration policies. UMF 114. In recent months, the IBEW has published similar statements critical of various Trump administration policies. UMF 115–116.

The Plaintiff Local Unions also exercised their First Amendment rights. For example, on August 12, 2020, IBEW Local 1245's then-Business Manager, Tom Dalzell, acting in his official capacity, published a statement describing Joe Biden and Kamala Harris as "two politicians who have personal relationships with Local 1245" for which he was "proud." UMF 118. Similarly, on August 9, 2024 IBEW Local 611 posted a video entitled "President Biden visits NM and supports Unions" with a caption stating "IBEW 611 supports those who support us." UMF 117.

### 2.     The Executive Orders are retaliatory actions against Plaintiffs.

The Executive Orders are "sufficient to deter a person of ordinary firmness…from speaking again." *Paxton*, 138 F.4th at 584. The Executive Orders constitute an adverse government action because they attempt to exclude the employees that Plaintiffs represent from federal labor law protections, including the right to collectively bargain over terms and conditions of employment. The OPM memorandum illustrates the intended effect of this punishment. Per OPM's instructions, the agencies covered by the Executive Orders "are no longer subject to the collective-bargaining requirements of chapter 71" and "are no longer required to collectively bargain with Federal unions." UMF 95. "[A] person of ordinary firmness would reasonably be deterred from engaging in further [protected activity] if he or she feared the loss of [such] job-related benefits." *Am. Fed'n of Gov't Emps., AFL-CIO v. Noem*, 785 F. Supp. 3d 833, 860 (W.D. Wash. 2025); *see also Ariz. Students' Ass'n v. Ariz. Bd. Of Regents*, 824 F.3d 858, 868–70 (9th Cir. 2016) (eliminating fee collection and remittance in response to First Amendment activity chills speech).

### 3.     There is a causal link between Plaintiffs' protected activity and the Executive Orders.

The President's actions and words leave little room for doubt that he issued the Executive Orders in response to the protected speech of the IBEW and the IBEW Local Unions. As another

court has found under similar circumstances, there is "solid evidence of a tie between the exercise of First Amendment rights" and the Executive Orders. *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 792 F. Supp. 3d at 1002, *order stayed pending appeal*, 148 F.4th 648 (9th Cir. 2025). In fact, this Court has already decided on multiple occasions that "the White House Fact Sheet" issued with the Executive Order "reflects retaliatory motive towards certain unions." *Nat'l Treasury Emps. Union,* 780 F. Supp. 3d at 255; *see also Am. Foreign Serv. Ass'n v. Trump*, 783 F. Supp. 3d at 265 (holding that the presumption of regularity is rebutted by contemporaneous evidence that the Executive Orders and Fact Sheet "reflect[] retaliatory motive[s]"); *Fed. Educ. Ass'n,* 795 F. Supp. 3d at 89 (same conclusion). The Fact Sheet makes clear that IBEW unions were targets of Executive Order 14251 because it specifically states that the Executive Order is intended to end collective bargaining with unions, like the IBEW, that are "hostile" to the Trump Administration and have "declared war on President's Trump's agenda." UMF 91–92. Where an Executive Order blatantly states that animus motivated the President's actions, the Court need not look any further than the President's own words. *Talbott v. United States*, 775 F. Supp. 3d 283, 326–27 (D.D.C. 2025) (finding that executive order and fact sheet on ban of transgender troops from the military "is soaked in animus and dripping with pretext").

The timing of Executive Order 14343 confirms this causal link. Just one week after other IBEW locals joined the AFL-CIO Case challenging Executive Order 14251, UMF 103, the President issued EO 14343, to cover additional IBEW-represented subdivisions of the DOI. UMF 104-106.[16] The temporal proximity between the litigation and the issuance of Executive

---

[16] A government action may also constitute retaliation where protected conduct is imputed to the plaintiff, and the government's adverse action is deliberately intended to chill the plaintiff from engaging in further First Amendment conduct. *See Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 274 (2016) ("To win, the employee must prove an improper employer motive."); *Jenner &*

Order 14343 demonstrates the administration's retaliatory motive and intent to chill further

protected expression from the Plaintiffs. *BEG Investments, LLC v. Alberti*, 144 F. Supp. 3d 16,

22 (D.D.C. 2015) ("close temporal relationship may *alone* establish the required causal

connection" for a First Amendment retaliation claim).[17]

The President's swift expansion of adverse measures against the same organization that

engaged in protected conduct opposing him plainly violates the First Amendment. *See Jenner &*

*Block LLP*, 784 F. Supp. 3d at 115 ("Retaliatory action against one . . . 'tells the others that they

engage in protected activity at their peril.'"). Accordingly, there is no dispute that Executive

Orders 14251 and 14343 are unconstitutional retaliatory acts in violation of the First

Amendment.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion

for summary judgment.

---

*Block LLP*, 784 F. Supp. 3d at 94 n.6 ("What matters is the administration's motive").

[17] This Court has held on three separate occasions that the Executive Orders, White House Fact Sheet, and OPM guidance collectively rebut the presumption of regularity that presumes that public officers have properly discharged their official duties. *See Fed. Educ. Ass'n,* 795 F. Supp. 3d at 89 ("[T]he Court reaches this conclusion for three reasons: (1) the Executive Order and the Administration's surrounding statements are at odds with Congress's findings in the FSLMRS; (2) the White House Fact Sheet reflects retaliatory motive; and (3) the Administration's guidance related to Executive Order—specifically, the OPM Guidance—suggests that the invocation of Section 7103(b)(1) was in furtherance of unrelated policy goals rather than based on the statutory criteria."). The same conclusion is warranted here.

Respectfully submitted,
KEKER, VAN NEST & PETERS LLP

Dated: December 19, 2025

By:     */s/ Laurie Carr Mims*

Brook Dooley *(pro hac vice pending)*
Laurie Carr Mims (D.C. Bar #487732)
Travis Silva *(pro hac vice pending)*
Claire Bonelli *(pro hac vice pending)*
Elizabeth Heckmann *(pro hac vice pending)*
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188
BDooley@keker.com
LMims@keker.com
TSilva@keker.com
CBonelli@keker.com
EHeckmann@keker.com

*Attorneys for Plaintiffs*
INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS